[Cite as *State v. Kraus*, 2013-Ohio-393.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2011-CA-35 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No.   TRC 1003814 |
| v. | : | |
| | : | |
| DAVID D. KRAUS | : | (Criminal Appeal from |
| | : | Fairborn Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

<u>O P I N I O N</u>

Rendered on the 8th day of February, 2013.

. . . . . . . . . . .

BETSY A. DEEDS, Atty. Reg. #0076747, Fairborn Prosecutor's Office, 510 West Main Street, Fairborn, Ohio 45324
  Attorney for Plaintiff-Appellee

CHARLES M. BLUE, Atty. Reg. #0074329, Murr, Compton, Claypoole & Macbeth, 401 East Stroop Road, Kettering, Ohio 45429
  Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, P.J.

{¶ 1} Defendant-appellant David D. Kraus appeals from his convictions and sentence upon one charge of Operating a Motor Vehicle While Under the Influence, in

violation of R.C. 4511.19(A)(1)(a); and one charge of Operating a Motor Vehicle While Under the Influence, Refusing a Chemical Test, with a Prior Conviction of OVI within the past Twenty Years, in violation of R.C. 4511.19(A)(2). Kraus contends that the trial court erred by overruling his motion to dismiss the charges upon speedy trial grounds, due to a six-month interval that elapsed between the time his first trial ended in mistrial and the time his second trial commenced. Kraus also contends that the trial court committed plain error by accepting a written verdict of guilty on the second charge despite an anomaly in the verdict form.

{¶ 2}   We conclude that trial court did not err in overruling Kraus's motion to dismiss the charges on speedy-trial grounds. The record does not demonstrate that the six-month interval between the mistrial and the re-trial sufficiently prejudiced Kraus to warrant dismissal of the charges. Kraus was not incarcerated during the interval, and has not demonstrated that he was subject to exceptional anxiety during that period. The record does not demonstrate that Kraus's ability to put on a defense to the charges was adversely affected to any significant degree by reason of the delay.

{¶ 3}   The jury was properly instructed on all of the elements it was required to find beyond reasonable doubt to convict Kraus of a violation of R.C. 4511.19(A)(2). One, and only one, of those elements – a prior conviction for OVI within the last 20 years – was set out on the jury verdict form, below the general verdict, as follows: "The Defendant was/was not (circle one) previously convicted of OVI within 20 years of the offense." Neither "was" nor "was not" was circled. Kraus did not object to the verdict form. Neither did Kraus raise this issue when the verdict was returned. This anomaly in the verdict form does not rise to the

level of plain error. There was no manifest miscarriage of justice, in view of the fact that Kraus stipulated to the admission of a certified copy of his conviction for OVI on June 21, 2007. He also acknowledged, during his direct examination, that he had been convicted of OVI in 2007.

{¶ 4} Accordingly, the judgment of the trial court is Affirmed.

## I. The Events Culminating in Kraus's Being Charged with Two OVI Offenses

{¶ 5} After Kraus left Shananigan's, a pool hall and bar in Fairborn, at about 1:00 in the morning one night in mid-April, 2010, he was stopped by State Trooper Dexter Howard. Howard had noticed that Kraus was "drifting" within his lane continuously, and was drifting a few inches over the broken white line occasionally. When Kraus made a turn at an intersection without signaling, Howard activated his overhead lights and stopped Kraus.

{¶ 6} Howard noticed immediately that when Kraus looked at Howard, "his head led the direction of his eyes." Howard explained that a sober person's eyes will lead the person's head in directing a gaze, but that with a person "who has been consuming," the opposite is the case.

{¶ 7} "Immediately" upon speaking to Kraus, Howard "smelled the very strong odor of alcoholic beverage coming off his breath." Howard also noticed slurred speech, and "very glassy, blood-shot eyes." When Howard asked Kraus for documentation, Kraus "fumbled around in his wallet" locating the requested information.

{¶ 8} Howard also noticed four unopened 16-ounce beer containers in a six-pack, with two places in the six-pack missing. Howard asked Kraus if he had been consuming any

alcohol, and Kraus said that he did have "a couple beers."

{¶ 9}   Howard asked Kraus to perform the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand test.   Kraus failed the horizontal gaze nystagmus test and the one-leg stand test.   He declined to complete the walk-and-turn test, saying that his knee was bothering him due to a football injury he had sustained in high school.   (Kraus was 26 at the time of the stop.)   During the testing, while Kraus was outside his car, Howard continued to smell the strong odor of an alcoholic beverage on his breath.

{¶ 10}   Howard arrested Kraus for OVI, and took him to the Fairborn police station after arranging to have Kraus's car towed.   Kraus refused a breath test, explaining that after a previous OVI arrest, his counsel had suggested that he not take the test.   Howard had explained the test, and the consequences of refusing the test, to Kraus.

{¶ 11}   Kraus was charged with three offenses: Operating a Motor Vehicle While Under the Influence of Alcohol, in violation of R.C. 4511.19(A)(1)(a); Operating a Motor Vehicle While Under the Influence of Alcohol, Refusing to Take a Chemical Test, and Having Been Convicted of OVI Within the Previous Twenty Years, in violation of R.C. 4511.19(A)(2); and a Marked Lanes violation.

## II.   The Course of Proceedings

{¶ 12}   Kraus was tried to a jury on all three charges on November 10, 2010.   The jury found Kraus guilty of the Marked Lanes violation, but was unable to reach a verdict on the two OVI charges, and a mistrial was declared as to those charges.   In early May, 2011,

Kraus moved to dismiss the charges, on speedy-trial grounds. The trial court took the motion under advisement, indicating that it would rule on the motion on the morning of the trial scheduled for May 11, 2011. No ruling on the motion is reflected in the record on appeal, but the trial proceeded on May 11, 2011, so we presume that the motion to dismiss was overruled.

{¶ 13} Trooper Howard testified for the State. Evan Moody, a friend of Kraus who had followed him after they both left Shenanigan's, testified for the defense. Kraus also testified in his own defense. Howard then testified for the State in rebuttal. Gary R. Mader, a Fairborn police sergeant who was in charge of the records of the department, and who was also a senior operator of the breath test machine at the department, also testified for the State in rebuttal.

{¶ 14} There is no transcript of the closing arguments or the jury instructions in the record on appeal, but written jury instructions are in the record, and two verdict forms, signed by all eight jurors, finding Kraus guilty of each OVI charge, are also in the record. There is an anomaly concerning the second verdict form, finding Kraus guilty of the violation of R.C. 4511.19(A)(2), which will be discussed in Part IV of this opinion, dealing with Kraus's Second Assignment of Error.

{¶ 15} Kraus appeals from his conviction and sentence for the two OVI offenses.

### III. The Record Does Not Demonstrate that Kraus Was Sufficiently Prejudiced by the Six-Month Interval Between the Mistrial and the Retrial to Merit the Dismissal of the Charges

{¶ 16} Kraus's First Assignment of Error is as follows:

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO DISMISS FOR VIOLATION OF HIS SPEEDY TRIAL RIGHTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

### A.   We Find It Unnecessary to Rely Upon *State v. Polhamus,* *infra,* Which May Be Distinguishable

{¶ 17}   As a threshold matter, we address the State's argument that, under *State v. Polhamus*, 2d Dist. Montgomery No. 17283, 1999 WL 1124605 (June 18, 1999), Kraus has failed to satisfy his initial burden of demonstrating that there has been a delay that is presumptively prejudicial.

{¶ 18}   Both parties agree that R.C. 2945.71(C)(2), which sets forth statutory time limits within which to bring an accused to trial, does not apply to a delay between a mistrial and a retrial.  *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982).  The statutory time limits may, nevertheless, serve as useful guidelines in determining what is a reasonable time for constitutional speedy trial purposes.  *Id.*

{¶ 19}   In *State v. Polhamus*, at *2, we cited *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), for the proposition that the record must demonstrate "some delay which is presumptively prejudicial" before there is any necessity to inquire into the *Barker v. Wingo* factors for determining whether a particular delay is reasonable.   In *Polhamus*, we found that a delay of 139 days between a mistrial and the commencement of a retrial was not sufficient to establish presumptive prejudice, thereby triggering a *Barker v. Wingo* analysis.

{¶ 20} The State contends that the delay in this case, approximately 180 days, is indistinguishable from the 139-day delay that we found insufficient in *Polhamus*. In reaching the conclusion in *Polhamus* that the 139-day delay in that case was insufficient to trigger a *Barker v. Wingo* analysis, we noted that the 139-day delay was less than half of the time – in excess of one year – that we had previously found presumptively prejudicial in *State v. Kelly*, 101 Ohio App.3d 700, 656 N.E.2d 419 (2d Dist. 1995). We also noted that the 139-day delay in that case was only barely in excess of one-half of the statutory time allowed for trial in that case, which was 270 days.

{¶ 21} In the case before us, the delay between the mistrial and the retrial was approximately 180 days. As in *Polhamus*, this 180-day interval was no more than half of the one-year interval we had found presumptively prejudicial (triggering a *Barker v. Wingo* analysis) in *State v. Kelly*. Unlike in *Polhamus*, however, the 180-day interval in this case is not less than half, but double, the statutory time allowed for trial in this case, which is 90 days.

{¶ 22} Thus, *State v. Polhamus*, upon which the State relies for the proposition that the delay in this case is not sufficient to trigger a *Barker v. Wingo* analysis, may well be distinguishable. We conclude in Part III-B of this opinion, below, that the application of the *Barker v. Wingo* analysis leads to the conclusion that the delay in this case was not sufficiently prejudicial to Kraus to merit the dismissal of the charges against him. Therefore, we find it unnecessary to determine whether Kraus has met his initial burden of demonstrating a presumptively prejudicial delay; we will assume, for purposes of analysis, that he has so demonstrated.

**B.  The Record Does Not Demonstrate that the 180-Day Interval in this Case Between**

**the Initial Mistrial and the Retrial Was Sufficiently Prejudicial**

**to Kraus to Merit the Dismissal of the Charges Against Him**

{¶ 23}  In *Barker v. Wingo, supra,* the United States Supreme Court laid down a framework for analyzing speedy-trial claims.   Four broad factors are: the length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. 407 U.S. 514, 530.   The court identified the length of delay as essentially a triggering mechanism.   "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  *Id.*   As noted in Part III-A, above, we will assume, for purposes of analysis, that the delay in this case of approximately 180 days, is sufficient to trigger analysis of the other factors.

{¶ 24}  The reason for the delay was illuminated to some extent in an affidavit of a legal assistant to defense counsel, submitted in support of Kraus's motion to dismiss the charges on speedy-trial grounds.   In that affidavit, the following averments were made:

2.  On or about March 9, 2011 I received a call from personnel at the Fairborn Municipal Court who desired to schedule a trial date in the above captioned matter.

3.  During that same telephone call I made a comment about not hearing about this case in quite some time and that I believed that the case was over.   The employee of the Fairborn Municipal Court stated that the file had been accidentally filed away and was just now located.

{¶ 25}  Since no other explanation for the delay appears in the record, we will assume that a negligent misfiling of the case file in the Fairborn Municipal Court was the cause for the delay.   This was obviously not the fault of Kraus.   But the fault attributable to the State

(through the agency of its judicial branch) is slight. Negligent misfilings are an unfortunate, but inevitable, occasional occurrence in any system of record-keeping. The reason for the delay in this case is therefore not "[a] deliberate attempt to delay the trial in order to hamper the defense," which "should be weighted heavily against the government," but "a more neutral reason such as negligence or overcrowded courts," which "should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstance must rest with the government rather than with the defendant." *Id*., at 531.

{¶ 26} The next factor – the defendant's assertion of his right – weighs in Kraus's favor, since he did move to dismiss the charges on speedy-trial grounds before his retrial commenced.

{¶ 27} The final factor is prejudice to the defendant. The United States Supreme Court identified three interests of the defendant that are subject to being prejudiced by delay: to prevent oppressive pretrial incarceration, to minimize anxiety and concern of the accused, and to limit the possibility that the defense will be impaired. *Id.*, at 532. The first interest – prevention of oppressive pretrial incarceration – is not at play in the case before us. Kraus was not incarcerated during the interval between the mistrial and the retrial.

{¶ 28} In *Barker*, the interval between the accused's arrest and trial was more than five years. *Id.,* at 516- 518. During the first ten months of that time, the accused was incarcerated, but then he made bond and was not incarcerated during the remainder of that time. *Id.* The accused was charged with two counts of murder. The opinion does not indicate whether the accused was subject to the possibility of the death penalty. Upon conviction, he was sentenced to life imprisonment. *Id.*, at 518. After conducting its analysis,

the United States Supreme Court affirmed a decision that the accused was not entitled to the dismissal of the charges on speedy-trial grounds. *Id.*, at 536. The Supreme Court characterized the prejudice to the accused in *Barker* as "minimal," while noting immediately thereafter that: "Of course, Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety." *Id*., at 534.

{¶ 29} In the case before us, Kraus was only subject to anxiety and concern for about 180 days. And unlike the defendant in *Barker*, he was not accused of murder, with the prospect of at least a life sentence hanging over him. Thus, while the anxiety and concern to which Kraus was subject during the 180 days between the mistrial and the retrial is a factor, it is entitled to little weight, like the fact that the delay appears to have been attributable, at least in part, to the negligent misfiling of his case file.

{¶ 30} The remaining factor – the impairment of the defendant's ability to prepare his case – is "the most serious * * * because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.,* at 532.

{¶ 31} One of the ways in which Kraus claims that the delay in his case impaired his defense is that a friend who was going to testify in his defense was unavailable to testify. When Kraus renewed his motion to dismiss during the trial, he raised this issue in the following colloquy:

> [Defense counsel]: I spoke with Mr. (INDECIPHERABLE) yesterday, indicated I was going to deliver a subpoena to him. He was aware that I was going to be doing that yesterday. He indicated he would be here, don't waste my time, I didn't need it, so I did not serve a subpoena on him, plus he's a friend of Mr. Kraus', he isn't

employed at the present, so we didn't need a subpoena or anything or any type of excuse from work.

As I left here during the lunch break, I received a call from Mr. (INDECIPHERABLE) to call Mr. (INDECIPHERABLE) to let him know to be here shortly after 1 o'clock. We will start at 1:20, which was what my arrangement was [sic] Mr. (INDECIPHERABLE) yesterday.

He indicated to Mr. Kraus that his infant son his [sic] sick; that he didn't have gasoline to get here. I indicated call him back, tell him that, you know, to bring his son and, you know, one of the other witnesses could watch his son while he was in here testifying; that Dave could give him gas money to get home if he could get here.

Anyway, he's indicated that he is not coming, so I do think there some [sic] prejudice in the last hour with Mr. (INDECIPHERABLE) absence. So I'm just renewing my motion to dismiss.

\* \* \*

MR. SULLIVAN [representing Kraus]: Obviously, we can't pick and choose when our children get sick and (INDECIPHERABLE) they get sick, so I don't think it was anything planned on Mr. (INDECIPHERABLE) part.

THE COURT: Okay. Well, that doesn't sound like you necessarily lost the witness because of the delay. You lost him – actually you knew here he was, you contacted him, you spoke to him, he said he was going to be here, so I'm going to overrule the motion to dismiss.

{¶ 32} We agree with the trial court. The 180-day delay between the mistrial and the

retrial was not the proximate cause of Kraus's inability to obtain the testimony of the witness. The events that transpired – the sudden illness of the witness's son – could just as easily have occurred if the re-trial had been scheduled just one week after the mistrial. The particular date of the sudden illness was fortuitous, and just happened to coincide with the day set for Kraus to present his witnesses.

{¶ 33}  Next, Kraus argues that the 180-day delay between the mistrial and the trial resulted in a "lack of recollection by the witnesses."  As one example, he refers to the fact that his friend, Evan Moody, could not recall whether he had a cell phone conversation with Kraus while they were driving, in separate cars, from Shenanigan's, before Kraus was stopped.  Kraus recalled the conversation, and testified that Moody had told him that a state trooper was following Moody, who was following Kraus.  Kraus could not remember if they discussed anything else.

{¶ 34}  We do not have a transcript of the original trial, so we do not know what either Moody or Kraus was able to recall of this conversation in their testimony at the first trial that they could not recall at the second trial.  There would not appear to be anything concerning this conversation of material consequence to the trial, and Kraus does not identify any aspect of the forgotten conversation that could have assisted his defense at the retrial.  We doubt that the jury would have found Moody, or Kraus, to have been any less credible as a witness because of an inability to remember a cell phone conversation, or, in Kraus's case, details of that conversation, that seems to have had no material relationship to the charged offenses.  Kraus and Moody did remember many facts that occurred in the hours preceding Kraus's arrest that were material to the charged offense.

{¶ 35}   We have not been provided with a transcript of the closing arguments to the jury, so we do not know whether the State argued to the jury that either witness was less credible because of an inability to remember seemingly trivial details of the events thirteen months earlier.   Perhaps an argument by the State along those lines could be used to demonstrate impairment of Kraus's ability to defend himself, but it is Kraus's burden to demonstrate error in the record, and he has not provided us with a transcript of the closing arguments.

{¶ 36}   Finally, Kraus argues that the 180-delay between the mistrial and the retrial impaired his defense because his "testimony was repeatedly the subject of impeachment by a prior inconsistent statement, namely his testimony from the prior trial."   The first colloquy Kraus cites to support this argument is worth quoting in full:

Q.  Mr. Kraus, I want to get a little bit more into the timing of that day, if you don't mind.

A.  Okay.

Q.  You testified that you went over to your friend's [sic] Rick's at what time?

A.  It has been 13 months ago, ma'am.

Q.  Okay.   But you were here and testified about this in November, correct?

A.  I can remember 7 months ago better than I can 13 months.

Q.  Okay.   Do you want to go back and look at what you said then?

A.  If you need to, yes.

Q.  Sure.   You have no idea when you first got there today; is that what you're telling us?

A. When I got here today?

Q. No, when you got to Rick Cassetta's house.

A. I can tell you it was around noon sometime, around.

Q. Okay.

A. Around that timeframe, early afternoon.

Q. Okay.   And when did you leave?

A. Later that evening, early evening, maybe.

Q. Earlier you testified you were there three or four hours.   That would put you there until about 3 or 4?

A. I said or more as well.

Q. I'm sorry?

A. I also said or more.

Q. So if the last time you were here you said you left between 6 and 7, that's probably about accurate?

A. If I testified to that, that's about right.

Q. Okay.   So you were there from noon or one to 6 or 7?

A. Yes.

Q. Okay.   And you arrived at Shenanigan's at what time?

A. It's between 8 and 9, I guess, if that's what I testified before.

Q. Okay.   So the time that you left Rick's house, which is in Midway?

A. Right.

Q. Correct, which is about 10 miles way [sic] from Fairborn.   Would you

say?

A. Yeah, give or take.

Q. So you left there at the latest 7?

A. Yes.

Q. Earliest you got to Shenanigan's, 8, 8:30?

A. Right.

Q. So it took you an hour and a half to get from Midway to Shenanigan's?

A. I wasn't going directly there to start with, ma'am.

Q. Okay, what did you do for an hour and a half?

A. I was driving around, test driving the car that I just built.

Q. Where?

A. All over.

Q. Did you drive to Dayton, did you drive to –

A. No –

Q. – Springfield –

A. – Springfield area.

Q. Did you make any stops? You didn't stop and have a couple drinks at a different bar?

A. No.

{¶ 37} The State's purpose with this line of questioning is evident. The State was attempting to establish that the time between Kraus's leaving his friend Casseta's house and Kraus's arrival at Shenanigan's was substantially in excess of the time required to drive

straight there, in support of an inference that Kraus stopped in the meantime and drank alcoholic beverages.

{¶ 38}  Although Kraus indicated that he could not presently remember the precise time he left Casseta's house, he vouched for his prior testimony in that regard by stating that if he previously testified that he left Casseta's between 6:00 and 7:00, than "that's about right." Satisfied with that response, the State made no further effort to impeach Kraus's testimony in that regard.  Again, we do not have a transcript of the State's closing argument, but we see no indication from the above-quoted exchange that Kraus was hampered in his ability to defend himself based upon the extent of the delay between the two trials.  If Kraus had claimed, at his second trial, that he had left Casseta's house later than 7:00, then the State could have impeached Kraus by pointing out the contradiction between that claim and his earlier testimony, but that did not happen.

{¶ 39}  Kraus next points to the following exchange on cross-examination:

Q.  Okay.  Now you testified to, who was present at Rick's?

A.  Emme, his – now his wife, and his son.  His Mom lives there, but she was upstairs the whole time.  She came down once to eat with us.

Q.  Okay.  Do you recall at the last trial when I asked you that same question you indicated just Emme was there; you didn't mention these other people?

A.  I must not have thought of his Mom seeing me drink or Levi seeing me drink.

Q.  But that wasn't – you acknowledge that was not the question; the question was who was there?

A. Yes.

Q. And how old is Levi. Levi is the baby?

A. Just an infant.

**{¶ 40}** The State did not continue this line of questioning.

**{¶ 41}** To begin with, this is a trivial point, with little or no materiality to the charges. And in terms of the possible impact of this line of questioning on Kraus's credibility, it should be noted that at the retrial Kraus is, if anything, remembering more detail – the presence of Casseta's mother and infant son – than he remembered at his first trial, so it is difficult to blame Kraus's recollection of additional details upon the lapse of time between the first trial and the retrial.

**{¶ 42}** Again, we have neither a transcript of the first trial, nor a transcript of the State's closing argument. In the absence of either, we cannot see how the above-quoted colloquy establishes that Kraus was significantly impaired in his ability to defend himself because of the 180-day delay between his first trial and his retrial.

**{¶ 43}** Finally, Kraus points to the following exchange during his cross-examination:

Q. Okay. Either of you [Kraus or Moody] offer to buy each other a drink [while they were at Shenanigan's]?

A. No.

Q. No?

A. No.

Q. Evan [Moody] didn't offer to buy you a drink?

A. No.

Q.   Okay.   Now, let's go back over this, you testified – excuse me – you testified about the same incident here in November, correct?

A.   Right.

Q.   And at that time you were under oath, correct –

A.   Yes.

Q.   – just like you are now?

A.   Yes.

Q.   Okay.   And it was important at that time to tell the truth, correct?

A.   Yes.

Q.   Okay.

MS. DEEDS [representing the State]: May I approach.

THE COURT: Yes.

**BY MS. DEEDS**:

Q.   I'm going to show you your testimony from the last proceedings, I wanted [sic] you to follow along with me.

MR. SULLIVAN: What page are you on?

MS. DEEDS: 116 to 117.

**BY MS. DEEDS:**

Q.   Okay.   Question.   So when you arrived at Shenanigan's, what does Evan do?   Answer, just sitting there watching a pool tournament.   Question.   And then the pool tournament at some point in time ends.   Yeah.   Question.   Okay.   What do you and Evan do then.   Answer, well, I went to play some pool and he offered to get

drinks, but I said I wasn't going to drink anymore because I was getting tired.

A.  Yes, that was at the beginning of the thing.  That is, if that's – if that's what I testified –

THE COURT: Mr. Kraus, you need to wait a minute because there's not a question.

**BY MS. DEEDS:**

Q.  Did I read that correctly?

A.  Yes.

Q.  Okay.

**{¶ 44}**  The State did not continue this line of questioning.

**{¶ 45}**  From Kraus's response to the prosecutor's recitation of his testimony at the prior trial, it appears that he was not suffering from a lapse of memory, but simply understood the State's present question as asking whether, as the evening wore on, either Kraus or Moody had offered to buy the other drinks, not whether Moody had initially offered to buy Kraus drinks.  In any event, the point is trivial.  Kraus's testimony at the retrial was that he did not have anything alcoholic to drink after having had two beers hours earlier at Casseta's house, and nothing in either his testimony at the retrial, or in his testimony quoted by the State above, indicated otherwise.

**{¶ 46}**  We have reviewed the entire transcript of the testimony of all the witnesses at Kraus's second trial, which resulted in the judgment from which this appeal is taken.  As we have previously noted, we have not reviewed the transcript of his previous trial, which ended in a mistrial, or the transcript of closing arguments at the retrial, because neither transcript has

been made part of the record of this appeal. From the record we have reviewed, we have found nothing to suggest that Kraus's ability to defend himself was significantly impaired by the 180 days that elapsed between his original trial and his retrial. Kraus and Moody, the only witnesses testifying for the defense, gave detailed accounts of their activities in the hours preceding Kraus's arrest. In Moody's case, this included the time from when Kraus joined Moody at Shenanigan's between 6:00 and 7:00 p.m., until Kraus's arrest. In Kraus's case, this included his activities from the preceding day, through a sleepless night, when he was putting the finishing touches on his car into which he had installed a new engine, continuing through his time at his friend Casseta's house, his driving around after leaving there and arriving at Shenanigan's, his leaving there, all the way through his encounter with Trooper Howard, culminating in his arrest.

{¶ 47} There were only minor inconsistencies between Moody's testimony and Kraus's testimony. (The only one that comes to mind is that Moody did not remember Kraus having had anything to drink at Shenanigan's, while Kraus testified that he ordered, and drank, a bottle of water.) The only inconsistencies between the testimony of either Moody or Kraus at the retrial and their testimony at the original trial, that were brought out during the retrial, have been noted above. They are of little to no significance, and, in the one case – Kraus's testimony concerning who was present when he was at Casseta's house – at most show that he remembered more detail at the retrial, not less.

{¶ 48} The *Barker v. Wingo* factors "have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker v. Wingo*, 407 U.S. 514, 533. We conclude that when the *Barker v. Wingo* factors are balanced in this case, they weigh

against the extreme remedy of the dismissal of otherwise meritorious criminal charges.

{¶ 49}   Kraus's First Assignment of Error is overruled.

### IV.   The Anomaly in the Verdict Form Concerning the R.C. 4511.19(A)(2) Charge Does Not Constitute Plain Error, Because No Manifest Injustice Is Demonstrated on this Record

{¶ 50}   Kraus's Second Assignment of Error is as follows:

AMBIGUITY IN THE VERDICT FORMS AND THE FAILURE OF THE JURY TO MAKE A FACTUAL FINDING RENDER THE JURY VERDICT INSUFFICIENT AS A MATTER OF LAW THEREBY DENYING MR. THOMPSON [SIC] HIS RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTIONS.

{¶ 51}   The elements of a violation of R.C. 4511.19(A)(2) include the following: operation of a motor vehicle while under the influence of alcohol, refusal to take a chemical test upon request of the arresting officer, and a conviction for OVI within the preceding 20 years.   The jury was properly instructed that the State had the burden to prove each of these elements beyond reasonable doubt.[1]

{¶ 52}   The written verdict forms pertaining to each of the two charged offenses,

---

[1] Although we do not have a transcript of the oral jury instructions in the record, the written jury instructions are in the record. In the absence of anything in the record to suggest the contrary, we presume that the trial court gave the instructions as written.

bearing the original signatures of all eight jurors, are in our record. The text of the verdict pertaining to the R.C. 4511.19(A)(2) offense is as follows:

> We, the Jury, find the Defendant Guilty of Operating Vehicle under the Influence of Alcohol or Drugs – OVI ORC 4511.19(A)(2)M1
>
> The Defendant was/was not (circle one) previously convicted of OVI within 20 years of the offense.

{¶ 53} Neither the word "was" nor the words "was not" are circled on the verdict form.

{¶ 54} Kraus acknowledges that the record does not reflect that any objection was interposed to either verdict form. He concedes that this assignment of error is therefore governed by the plain-error standard of appellate review.

{¶ 55} Kraus first argues that the two verdict forms do not sufficiently distinguish between the two OVI charges. The jury was properly instructed as to each charge, even to the extent that it was instructed that it could not find Kraus guilty of the R.C. 4511.19(A)(2) charge if it did not also find him guilty of the R.C. 4511.19(A)(1)(a) charge (since the two verdicts would be inconsistent, otherwise). And each verdict form specifies the section of the Ohio Revised Code establishing the offense of which Kraus was convicted under that charge. We conclude that each verdict form reflects that Kraus was found guilty of the particular charge to which that verdict form pertains.

{¶ 56} Kraus then argues that the verdict form pertaining to the R.C. 4511.19(A)(2) charge is not sufficient to establish that the jury convicted him of that offense because it lists one (but only one) of the elements – that the defendant was convicted of OVI within the 20

years preceding the offense, with the words "was/was not" preceding that element, and neither option was circled.

{¶ 57}  This assignment of error is governed by the plain error standard.  A reversal of a judgment based upon a plain error "is to be taken with the utmost caution, under exceptional circumstances *and only to prevent a manifest miscarriage of justice*."  *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990) (emphasis added).

{¶ 58}  Again, the jury was correctly instructed that Kraus's having been convicted of OVI within 20 years preceding this offense was an element of the offense that the State had to prove beyond reasonable doubt, before the jury could find Kraus guilty.  A certified copy of Kraus's 2007 conviction for OVI was stipulated into evidence.  Early in Kraus's direct testimony, he acknowledged that he had been convicted of OVI in 2007.  Under these circumstances, we cannot find a manifest miscarriage of justice in this case.

{¶ 59}  As the State notes, there was no necessity that the verdict form list any of the elements comprising the offense, in contradistinction to a specification enhancing the degree of an offense, or enhancing the penalty that can be imposed for an offense.  Nevertheless, even a gratuitous listing of an element on a verdict form might impeach the reliability of the verdict under other circumstances, since it might cast doubt as to whether the jury in fact found the defendant guilty of the offense.  If the gratuitously listed element were seriously in contention, as opposed to having been conceded by the defendant, there were a failure to circle the appropriate verbiage in a "was/was not" formulation, and the issue were raised in the trial court, for example, we would have no hesitancy in reversing a conviction under those circumstances.

{¶ 60} This case exemplifies the reason for requiring a heightened standard of prejudice for plain error – in this case, a manifest miscarriage of justice. If the anomaly of the jury verdict form had been brought to the attention of the trial court before the jury returned the form, the anomaly could easily have been corrected. Even if the anomaly had been brought to the attention of the trial court after the jury returned the form, but before the jury's verdict was entered and the jury was discharged, the trial court could have returned the R.C. 4511.19(A)(2) charge to the jury for further deliberations, with a corrected verdict form, and appropriate instructions, avoiding the necessity of another trial in this case.

{¶ 61} Kraus's Second Assignment of Error is overruled.

## V. Conclusion

{¶ 62} Both of Kraus's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.


Copies mailed to:

Betsy A. Deeds
Charles M. Blue
Hon. Beth W. Root