[Cite as *State v. Miller*, 2014-Ohio-3907.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No.   100461

---

# STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

# LEELIN J. MILLER

### DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-572533

**BEFORE:**  Boyle, A.J., Kilbane, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:**  September 11, 2014

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Stephanie N. Hall
Mahmoud Awadallah
Assistant County Prosecutors
Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, A.J.:

{¶1}    Defendant-appellant, Leelin Miller, appeals his convictions and sentence for aggravated murder, aggravated robbery, murder, kidnapping, felonious assault, grand theft, and having a weapon while under disability.   The charges arose from the shooting of Richard McCoy (referred to as "Rich"), who died on February 9, 2013.   Finding no merit to the appeal, we affirm.

## Procedural History and Facts

{¶2}    Miller was indicted in a nine-count indictment on the following charges: two counts of aggravated murder in violation of R.C. 2903.01(A) and (B); aggravated robbery in violation of R.C. 2911.01(A)(3); kidnapping in violation of R.C. 2905.01(A)(2); murder in violation of R.C. 2903.02(B); felonious assault in violation of R.C. 2903.11(A)(1); having a weapon while under a disability in violation of R.C. 2923.13(A)(2); grand theft in violation of R.C. 2913.02(A)(1); and theft in violation of R.C. 2913.02(A)(1).   All of the charges carried a one- and three-year firearm specification.   The aggravated robbery, kidnapping, and felonious assault counts also carried notices of prior conviction and repeat violent offender specifications.

{¶3}    Miller pleaded not guilty to all the charges.   He elected to have the repeat violent offender specification, the notice of prior conviction specifications, and the having a weapon while under disability count tried to the bench.   The remaining charges proceeded to a jury trial. The following evidence was presented.

{¶4} On February 9, 2013, Cleveland police and EMS responded to a 911 call reporting a gun fired and a male having been shot at 11905 Princeton Avenue. Rich's mother, Parbida McCoy, who lived at the Princeton Avenue residence with her son, testified that upon hearing her son ring the doorbell and knock at the same time, calling out "Momma, Momma, Momma," she ran to the door and discovered that Rich had been shot. Rich told her to call the police, and then he came inside, sat down, and then went outside where he collapsed immediately after EMS's arrival. According to Parbida, Rich laid his sweat jacket on the kitchen floor right after he told her to call the police. Parbida later gave the sweat jacket to the police without washing it.

{¶5} EMS transported the victim to the hospital, where he was subsequently pronounced dead at 11:58 p.m. The medical examiner ruled Rich's death as a homicide caused by a "gunshot wound that [Rich] sustained to his body and the injuries that were caused to his liver and intestines."

{¶6} According to the medical examiner, Rich sustained a gunshot wound "that came on the right side, right flank, just near the bottom of the rib cage." The medical examiner further opined that the "bullet came from the back of the body towards the front, coming from the right side of the bottom going towards the left." The bullet exited the body on the front left side of Rich's abdominal wall just below the belly button. The medical examiner further acknowledged that the victim's injuries were consistent with the victim being seated and shot from behind.

**{¶7}** The medical examiner also testified there were no signs of any injury that would have immediately caused Rich to collapse; instead, "[i]t would be possible for an individual like this to have some period of activity afterwards." As to Rich's toxicology results, the medical examiner stated that Rich had a .082 level of alcohol; cocaine and a low level of PCP were also detected.

**{¶8}** The state presented the testimony of Mario Godfrey, who was with Rich up until the shooting and identified Miller as the shooter. Godfrey testified that he and Rich, who were good friends, spent the day together "just kickin' it"— shopping, drinking, smoking some marijuana, and driving around in Rich's new van, starting at around noon on February 9. The two ultimately stopped around 9:00 p.m. at the auto shop recently acquired by Rich's friend, James Ellery Diggs ("El") — Miller's cousin.

**{¶9}** At the auto shop, Rich introduced Godfrey to Miller, who was from the same neighborhood and hanging out at the shop along with El and two other individuals. While at the auto shop, Rich and El got in a heated argument over $200. El claimed Rich owed him the money, and Rich denied ever getting it. According to Godfrey, El and Rich went into a back room to discuss their disagreement. El appeared to still be mad when he came out, but then told Rich upon his leaving to "forget the money," reaffirming that Rich was still his "dude."

**{¶10}** Rich and Godfrey proceeded to get in Rich's van to leave when Miller approached them, "askin Rich about the money." After Rich told Miller to get in the van, the three of them left the auto shop together. Miller sat in the back passenger seat behind

Rich, who was driving, and Godfrey sat in the front passenger seat. According to Godfrey, Rich and Miller continued to talk about the $200 dispute between Rich and El. The conversation apparently ended, however, when they spotted a Maple Heights police officer on the side of the road, "clocking" other drivers for speeding. At that point, Miller told Rich to "drop me off," indicating that he had a gun on him. According to Godfrey, Miller was "stressing" and wanted to be dropped off after seeing the police officer. Godfrey testified that Rich ignored Miller's repeated requests to be dropped off and continued driving to where he needed to go.

{¶11} Upon turning on Rich's street, Miller told Rich "one last time, I need you to drop me off," which Rich stated "for the last time, I ain't gonna be able to do that." Godfrey testified as to the specific details leading up to the shooting as follows:

> [Miller] grabbed Rich by his collar with his left hand and he had the gun on him with his right hand. * * * So Rich tell him like, man, you gonna shoot me, man, because I ain't gonna drop you off? He kinda turned like Rich face towards him like he was trying to fire the gun but the gun didn't go off. So Rich, he tell Rich to pull over. Rich pull over on 121st and Princeton. So as he pullin' over he got Rich by his collar so Rich can't go nowhere. I'm on the passenger side. I'm looking at the peripheral vision of my eye because I don't want to just look straight at him because I don't want to see if he pulled the gun off on Rich. He back there messin' with the gun so he can get the gun together. When he got it together, he lowered it to his side, to Rich right-hand side, and shot him.

{¶12} At this point, Godfrey ran out of the van and up the street to his uncle's house. Godfrey testified that he was not sure if Miller actually shot Rich because he saw Rich "running up the street." Godfrey then saw Miller take off in the van.

{¶13} Godfrey called his girlfriend to pick him up and told her what happened. Godfrey did not call Rich because he was "scared." Godfrey received a telephone call the following morning and learned that Rich was dead. According to Godfrey, Miller also called him the next evening, threatening him that "same thing gonna happen to [you] that happened to Rich if [you] open [your] fuckin mouth."

{¶14} Godfrey testified that, in addition to telling his girlfriend, he told his parents what happened, all of whom encouraged him to contact the police. He further explained that, because of his criminal record, he was afraid to contact the police, fearing that the police would see him as a suspect. Godfrey acknowledged that he had previously been convicted of aggravated robbery, aggravated burglary, kidnapping, and a drug charge involving trafficking in PCP.

{¶15} Godfrey testified that he feared Miller, resulting in him hiding in his house after the shooting. After consulting with an attorney, Godfrey eventually contacted the police and provided a written statement regarding the shooting. On cross-examination, Godfrey explained that it took him weeks to report the shooting because "everybody had knew about the situation already[,]" and he "felt like the police was gonna know, and they was gonna take care of it themselves." According to Godfrey, "[Miller] told people" what happened.

{¶16} Maurita Mays, Godfrey's girlfriend, testified that Godfrey called her in the evening on February 9, 2013, and asked her to pick him up at his uncle's house. According to Mays, Godfrey told her that "some effed up stuff had happened. That

[Miller] shot Rich." Mays testified that Godfrey was crying when he told her and that the two of them were in shock. Mays testified that they went to the Fourth District to report the shooting but that Godfrey never went inside. Mays testified that she told Godfrey to get an attorney first before reporting it to the police.

{¶17} The state also offered the testimony of Godfrey's mother, who corroborated that Godfrey told her about the shooting the next day. According to Godfrey's mother, she too told him that he had to report the shooting to the police.

{¶18} Cleveland police detective Ignatius Sowa testified that he and his partner, Raymond Diaz, investigated Rich's death. They interviewed several people, including Rich's mother, and recovered the Puma sweatshirt believed to be worn by Rich the night of the shooting. Det. Diaz testified that on March 7, 2013, Godfrey contacted him and provided a statement consistent with his testimony at trial. After speaking with Godfrey, the police arrested Miller.

{¶19} After Miller's arrest, Miller agreed to speak with the detectives and provided a statement as to his activities on February 9, 2013. According to Miller's statement, he was present at El's car lot in Maple Heights when Rich and Godfrey arrived in Rich's van. Miller did not recall any argument. He further stated that he asked Rich, who he considered a lifelong friend, for a ride back to Cleveland, and they all left together in the van. According to Miller's statement, Rich dropped [Godfrey] off first, and then he dropped Miller off at a girl's house. Miller reported never seeing Rich again after that.

**{¶20}** Det. Sowa elaborated on cross-examination that Miller told the police that Rich dropped him off at Theresa Smith's house, a friend of Miller's girlfriend and that from Theresa's house, he went to the bar "Grownups," where his girlfriend worked as a barmaid. Det. Sowa admitted that he never went to Grownups to investigate Miller's story because Theresa — "the person who has the most knowledge that could most easily verify what he is telling us[,] tells us[:] I can't confirm or deny that he was here that night. He stops by frequently. He stays sometimes longer than others. But it was inconclusive."

**{¶21}** Det. Sowa further testified that Miller "was interested in knowing where we were getting the information we were getting and who we were getting it from. He wanted to know who we talked to." Det. Sowa also indicated that Miller represented during the interview that only three people "knew what happened": "Richard's little dude and him." Det. Sowa also stated that he and his partner "went over * * * in detail" with Miller his statement that "[Godfrey] was dropped off first and he was dropped off last" — leaving Miller the last one in the car with Rich.

**{¶22}** According to Det. Sowa, Godfrey's cell phone records, which the police retrieved as part of their investigation, corroborated Godfrey's testimony that he telephoned his girlfriend "shortly after" the shooting and telephoned his mother the next day.

**{¶23}** Det. Sowa further testified that he was not successful in interviewing El, the owner of the car lot, despite attempting to do so on many occasions. He acknowledged,

however, that Miller consented to the search of his cell phones as well as his hotel room where he was staying the day before his arrest and to the search of two vehicles.

{¶24} Det. Sowa further testified that the police never located Rich's van. Det. Sowa further corroborated the testimony of the other officers that the state presented at trial as to the difficulty in gathering information from the residents in the area. Specifically, Det. Sowa testified that in the Fourth District, the location where the shooting occurred, people do not want to get involved in police investigations nor do they want to be known as a "snitch" in the neighborhood.

{¶25} The state offered testimony from forensic scientist Daniel Mabel. According to Mabel, gunshot residue was found on Rich's hands. Mabel further testified that he would expect to find gunshot residue on a person if the person was inside a vehicle and the gun was shot close to him. Mabel also conducted a trace metal detection test on Rich's hands to identify the existence of any traces of metal particles left on the hands. Mabel explained that if a reaction occurs, "it will look like a pattern of whatever the object was * * * maybe we can see a pattern, the back strap of gun, or handle of a knife, or something like that." Mabel, however, did not get any reaction on Rich's hands in this case.

{¶26} Mabel further testified that he examined the black Puma hooded sweatshirt, previously identified as having been the outer layer worn by Rich on the night of the shooting. The front of the sweatshirt contained a blood stain. Mabel further conducted a fiber comparison of the sweatshirt and performed tape lifts on a brown leather jacket,

reported to be worn by Miller.   Mabel did not discover any blood stains on the leather jacket but "found some fibers on the tape lifts that were similar to the fibers [he] had found in the victim's sweatshirt.

{¶27} At the conclusion of the state's case, the trial court granted Miller's Crim.R. 29 motion with respect to the theft charge on Count 9 of the indictment but denied it to the remaining counts.

{¶28} In support of his defense, Miller presented a single witness, Kenneth Davis, who corroborated Miller's statement that he was at Grownups on the night of the shooting.  Davis testified that he specifically remembered seeing Miller at the bar on February 9, 2013, a Saturday, because he had run into Miller earlier that evening (around 7:45-8:00 p.m.) at a gas station where the two exchanged music CDs and "talked about going" to the bar.   Davis further explained that February 9 stands out in his mind because he collects car payments on the ninth of every month as part of his business.

{¶29} According to Davis, he arrived at Grownups at 9:15 p.m. and Miller was already sitting at the bar.   Davis testified that they stayed at the bar until closing.   Davis testified that he learned about Rich's death in March and "they were saying a guy named Mario or somebody had something to do with it."   Davis further indicated that he first spoke to Miller's defense counsel two days prior to testifying at trial and that he came forward upon the request of Miller's girlfriend.

{¶30} On cross-examination, however, Davis acknowledged speaking to the prosecutor just 20 minutes before taking the stand and that during their conversation,

Davis was not exactly sure of the date. He admitted that only after meeting with the defense attorney, he knew the exact date. He also testified that he knew it was around 7:45 p.m. when he first saw Miller at the gas station because it was "getting ready to get dark outside." According to Davis, it gets dark around "7:00, 7:30" in the wintertime in Cleveland, Ohio. He also reiterated that he closed his shop around 6:30 p.m., so it had to be after that time when he ran into Miller at the gas station. Davis further indicated that he knew it was 9:15 p.m. when he walked into the bar because he saw the time on a clock on the wall. Davis also admitted to having a criminal record, including convictions for having a weapon under disability, failure to comply with lawful order of a police officer, trafficking in drugs, and obstruction of justice.

{¶31} The jury found Miller not guilty of one of the aggravated murder counts as contained in Count 1 of the indictment but guilty of the remaining counts and attached firearm specifications. The trial court subsequently found Miller guilty of the having a weapon while under disability charge. The court additionally found Miller guilty of the repeat violent offender and notice of prior conviction specifications but did not impose any sentence for them.

{¶32} At sentencing, the trial court found that the following offenses merged as allied offenses: (1) the aggravated murder, murder, and felonious assault counts; and (2) the aggravated robbery, kidnapping, and grant theft counts. The trial court found the having a weapon while under disability count was not an allied offense to any other

offense. The state elected to proceed on the aggravated murder and aggravated robbery counts.

**{¶33}** The trial court imposed an aggregate sentence of 49 years to life. Specifically, the court sentenced Miller to 30 years to life on the aggravated murder count plus a three-year consecutive sentence for the firearm specification; ten years on the aggravated robbery count plus a three-year consecutive sentence for the firearm specification; and three years for the having a weapon while under disability count, ordering all counts to be served consecutive to one another.

**{¶34}** Miller appeals his conviction and sentence, raising seven assignments of error.[1]

<u>Motion for a Mistrial</u>

**{¶35}** In his first assignment of error, Miller argues that the trial court erred in denying his motion for a mistrial after Det. Sowa improperly implied that an anonymous tip identified Miller as the shooter even before Godfrey contacted the detective. He argues that Det. Sowa's testimony was so prejudicial that the trial court's subsequent curative instruction could not undue the harm and that the testimony deprived him of a fair trial. We disagree.

**{¶36}** The denial or grant of an order of mistrial lies within the sound discretion of the trial court. *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995). An appellate court will not disturb the exercise of that discretion absent a showing that the accused has

---

[1] The seven assignments of error are attached in Appendix A.

suffered material prejudice. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987).

A mistrial should be declared only when the ends of justice so require and "a fair trial is no

longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶37} Specifically, Miller complains of the following statements made by Det.

Sowa in response to the prosecutor's questions during direct examination:

[Prosecutor]: Q. Okay. In speaking with Mr. Godfrey, were you able to develop a person of interest in this case?

A. We had already —

[Defense Counsel]: Objection.

THE COURT: Sustained.

Q. In speaking to Mr. Godfrey, were you able to — did you learn anything of importance?

A. Yes.

Q. Did it help you in your investigation?

A. Yes.

Q. What is that information?

A. The details of the circumstances surrounding the death of Richard McCoy.

Q. Did you learn of a name of a person who was the alleged perpetrator of this?

A. There was a confirmation.

[Defense Counsel]: Objection, your Honor.

THE COURT: Sustained. Sustained.

**{¶38}** Following the objection, defense counsel moved for a mistrial. The trial court denied the motion but immediately provided the following curative instruction to the jury:

> THE COURT: Ladies and gentlemen, I wanted you to disregard the last statement of the witness with respect to any alleged confirmation. There is to be no testimony about any alleged anonymous tips. Defense counsel does not have the opportunity to cross-examine these so-called tipsters. So disregard any of that testimony. I'm going to instruct the witness not to go down that path. I've given him the opportunity to lead you to avoid these pratfalls. But I'm instructing you right now again, in front of the jury, you are not to go there.
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Go ahead.

**{¶39}** Here, we cannot say that Det. Sowa's statement deprived Miller of a fair trial. The trial court admonished Det. Sowa for his improper statement and immediately provided a thorough curative instruction, which the jury is presumed to follow. *See Garner*, 74 Ohio St.3d at 59, 656 N.E.2d 623. Moreover, contrary to Miller's claim, this is not a case based solely on circumstantial evidence; indeed, the state presented direct evidence through the eyewitness testimony of Godfrey, who was with Rich and Miller up until the shooting. Godfrey's testimony was further substantiated by other evidence presented by the state, including Miller's own statement placing him with Rich and Miller on the night of the shooting. Considering the entire record, we find that Det. Sowa's statement was harmless beyond a reasonable doubt.

**{¶40}** For this same reason, we find *State v. Beckworth*, 8th Dist. Cuyahoga No. 97318, 2012-Ohio-3076, distinguishable from the instant case. In *Beckworth*, the state's

entire case was based on purely circumstantial evidence without a single witness identifying the defendant as the killer, let alone seeing the defendant with a gun. The only evidence directly linking Beckworth as the killer was the improper testimony from a codefendant as to what the other, non-testifying, codefendant told her. The same concern of the paucity of the evidence that existed in *Beckworth* does not exist in this case.

**{¶41}** Based on curative instruction provided, as well as the absence of any material prejudice from the statement made, we cannot say that the trial court abused its discretion in denying Miller's motion for a mistrial. The first assignment of error is overruled.

<u>Allied Offenses</u>

**{¶42}** In his second assignment of error, Miller argues that the trial court erred in imposing separate sentences for the offenses of aggravated murder, aggravated robbery, and having a weapon while under disability because they are allied offenses, subject to merger.

**{¶43}** When a defendant's conduct results in the commission of two or more "allied" offenses of similar import, that conduct can be charged separately, but the defendant can be convicted and sentenced for only one offense. R.C. 2941.25(A). In determining whether offenses merge, we consider the defendant's conduct. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 44. "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447,

2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting). If we answer both questions affirmatively, then the offenses are allied offenses of similar import and will be merged. *Johnson* at ¶ 50; *see also State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 13 (offenses of similar import do not merge if the offenses at issue "were committed separately or with a separate animus").

**{¶44}** The trial court conducted a merger analysis in this case and determined that (1) the aggravated murder, murder, and felonious assault counts merged; (2) the aggravated robbery, kidnapping, and grand theft counts merged; and (3) the having a weapon while under disability count stood alone. The trial court further merged the accompanied one-year firearm specifications into the three-year firearm specifications. Miller contends, however, that "all of the counts were committed by the same conduct, with a single animus against a single victim and, therefore, they should have all merged for sentencing." We disagree.

**{¶45}** With respect to the offense of having a weapon while under disability, this court has repeatedly recognized that the "'animus of having a weapon under disability is making a conscious choice to possess a weapon.'" *State v. Hodges*, 8th Dist. Cuyahoga No. 99511, 2013-Ohio-5025, ¶ 19, quoting *State v. Cowan*, 8th Dist. Cuyahoga No. 97877, 2012-Ohio-5723, ¶ 39. Where the defendant "necessarily acquired a weapon sometime prior to committing the other crimes, the fact that he then used the weapon to commit the other crimes does not absolve [the defendant] of the criminal liability that arises solely from his decision to illegally possess the weapon." *Cowan* at ¶ 39.

**{¶46}** Here, the record reveals that Miller, who was under a disability as defined by statute, made a conscious decision to possess a gun prior to even stepping foot in the van. Miller first informed Rich and Godfrey that he had a gun on him when they spotted the Maple Heights police officer "clocking" other drivers. The subsequent aggravated robbery and aggravated murder did not occur until after Miller became enraged upon Rich's refusal to "drop him off." Based on this record, it is clear that the offense of having a weapon while under disability was committed with a separate animus from the aggravated murder and aggravated robbery. Therefore, the trial court properly did not merge this conviction with the aggravated murder and aggravated robbery.

**{¶47}** As for the aggravated murder and aggravated robbery counts, the state argued that Miller committed the two offenses with a separate animus, thereby rendering the offenses not subject to merger. Applying *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, Ohio courts have recognized that the offenses of aggravated robbery and aggravated murder do not merge "'where the force used to effectuate the aggravated robbery is far in excess of that required to complete the robbery, or where the circumstances suggest that a separate intent to kill existed[.]'" *State v. Reid*, 2d Dist. Montgomery No. 25790, 2014-Ohio-1282, ¶ 12, quoting *State v. Jackson*, 2d Dist. Montgomery No. 24460, 2012-Ohio-2335, ¶ 140; *see also State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 48 (shooting victim in face and head from close range during course of aggravated robbery demonstrated a specific intent to kill;

aggravated murder and aggravated robbery were separately punishable under R.C. 2941.25(B)).

**{¶48}** In this case, Miller purposefully shot Rich at close range, delivering a fatal bullet to Rich's torso. Given the degree of force and the location of the bullet, we find that the trial court reasonably concluded that Miller possessed a separate intent to kill Rich apart from the aggravated robbery. Under these circumstances, the aggravated murder and aggravated robbery do not merge.

**{¶49}** The second assignment of error is overruled.

Sufficiency of the Evidence

**{¶50}** In his third assignment of error, Miller argues that the trial court erred by denying his motion for acquittal on all of the counts because the state failed to present sufficient evidence.

**{¶51}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶52} Focusing on the state's failure to produce physical and concrete evidence linking Miller to the crimes, such as the firearm used in the shooting or any DNA evidence, Miller argues that the state's evidence was insufficient to sustain the convictions. Miller's argument, however, glosses over Godfrey's testimony, which standing alone established each of the elements of the crimes. Godfrey's testimony revealed that Miller pulled out his gun, grabbed Rich by the neck, and ultimately shot him on his right-hand side as a means to take Rich's van. Godfrey's testimony, if believed, was sufficient direct evidence upon which a rational trier of fact could rely in finding Miller guilty beyond a reasonable doubt, even in the absence of any physical evidence. *See State v. Totty*, 2d Dist. Montgomery No. 23372, 2010-Ohio-1234, ¶ 21 ("The lack of physical evidence does not undermine an eyewitness's testimony that, if found credible, is sufficient to sustain a conviction.").

{¶53} We further note that the state presented other circumstantial evidence that corroborated various aspects of Godfrey's testimony. For example, the medical examiner testified that Rich's injuries were consistent with Rich being seated and shot from behind. Miller placed himself in the van with Godfrey and Rich, sitting immediately behind Rich. Additionally, Miller implicated himself in his interview with the police, expressing that only he and Godfrey knew what happened yet stating Godfrey was dropped off before him.

{¶54} "When assessing evidentiary sufficiency, we do not second-guess the factfinder's credibility determinations; rather, we ask whether, if believed, the evidence

would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Smith*, 8th Dist. Cuyahoga No. 100338, 2014-Ohio-2186, ¶ 16, citing *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), and *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

**{¶55}** Construing the evidence in a light most favorable to the state, we find that sufficient evidence exists to support the convictions.

**{¶56}** The third assignment of error is overruled.

Manifest Weight of the Evidence

**{¶57}** In his fourth assignment of error, Miller argues that his conviction is against the manifest weight of the evidence.

**{¶58}** When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Id.* Although the appellate court may act as a thirteenth juror, it should give due deference to the findings made by the factfinder. *Id.* at 388. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id.*

{¶59} Miller argues that the state's entire case hinged on the testimony of Godfrey — a convicted felon with no credibility and one that had a motive to lie. Miller emphasizes that Godfrey failed to contact the police until almost a month after the shooting and after hiring an attorney. He further contends that Godfrey was impeached at trial — Godfrey first told the police that Miller shot Rich, but then Godfrey indicated at trial that maybe Miller shot at the floor and not at Rich.

{¶60} We find Miller's arguments unpersuasive. First, contrary to Miller's characterization, we do not find Godfrey's statements to the police and his testimony at trial to be inconsistent. Godfrey explained at trial that he thought that maybe the bullet fired from Miller's gun missed Rich because he saw Rich subsequently running up the street. But he testified that, prior to seeing Rich running, he observed Miller lower his gun to Rich's right-hand side and shoot him. This testimony is consistent with Godfrey's statement to the police.

{¶61} As for Godfrey's credibility, the jury heard all of the arguments raised by Miller and obviously found Godfrey's story credible. Again, although he denied any argument or shooting, Miller expressly placed himself in the vehicle with Rich and Godfrey. And while the jury clearly found Miller's sole defense witness not credible, we note that Davis did not come forward until the time of trial and that his testimony was not believable. On direct examination, he claimed to be positive of the date that he ran into Miller, a statement later contradicted by his cross-examination. We simply cannot say

that the jury lost its way in believing Godfrey's testimony, even if contradicted by Davis's or Miller's statements.

{¶62} The fourth assignment of error is overruled.

Discovery under Crim.R. 16 and
Application of Evid.R. 801(D)(1)(b)

{¶63} In his fifth assignment of error, Miller argues that the trial court should have excluded the testimony of Godfrey's mother, Sharon Means, and Godfrey's girlfriend, Maurita Mays, because neither one was timely disclosed as a witness in discovery and their testimony constituted inadmissible hearsay.

*Discovery Violation*

{¶64} Miller contends that the state did not comply with Crim.R. 16 because it failed to timely disclose the names of Means and Mays as witnesses. Miller argues that the untimely disclosure amounted to unfair surprise that prejudiced his defense and warranted exclusion of the witnesses at trial. The state counters that the prosecutor provided the names of the witnesses as soon as he learned of them and that Miller suffered no material prejudice.

{¶65} "The purpose of the discovery rule is to provide the parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system, the rights of defendants, and the well-being of witnesses, victims, and society at large." Crim.R. 16(A). Crim.R. 16(I) governs the disclosure of witnesses and provides that "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its

case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal." Under Crim.R. 16(B)(2), the state is also required to provide the criminal records of its witnesses.

{¶66} If it is brought to the attention of the trial court that a party has failed to comply with the discovery rule, the trial court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." *State v. Moore*, 7th Dist. Mahoning No. 12MA8, 2013-Ohio-1435, ¶ 42, quoting Crim.R. 16(L)(1). If the trial court chooses to impose a sanction, however, it "must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), syllabus at paragraph two.

{¶67} We review a trial court's sanction for a discovery violation under an abuse of discretion standard. *State v. Tran*, 8th Dist. Cuyahoga No. 100057, 2014-Ohio-1829, ¶ 9. A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable or arbitrary. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶68} Here, the record reveals that the prosecutor notified Miller's defense counsel of his intention to call Means and Mays as soon as he learned their names and who they were. The prosecutor further provided the defense with a copy of the witnesses' criminal records. Miller offers no evidence of the prosecutor knowing of these witnesses prior to the time of the prosecutor's disclosure.

**{¶69}** Moreover, even assuming that the prosecutor's late disclosure of the witnesses constituted a discovery violation, we find that the trial court imposed the least severe sanction consistent with the discovery rules. Specifically, the trial court afforded Miller's defense counsel the opportunity to interview the witnesses before they testified, thereby negating any unfair surprise. We therefore find no abuse of discretion by the trial court.

*Evid.R. 801(D)(1)(b)*

**{¶70}** Miller further contends that Means's and Mays's testimony constituted inadmissable hearsay that did not fall within the ambit of Evid.R. 801(D)(1)(b).

**{¶71}** Pursuant to Evid.R. 801(D)(1)(b):

> A statement is not hearsay if: * * * [t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive.

**{¶72}** The state offered Means and Mays as witnesses to rebut the defense's express attack on Godfrey's credibility and alleged improper motive to implicate Miller for the shooting. Specifically, the state offered these two witnesses to testify as to what Godfrey told them, consistent with what Godfrey had already testified at trial.

**{¶73}** Evid.R. 801(D)(1)(b), however, does not allow all prior statements; "rather, admission is restricted to 'consistent statement[s] made by the witness prior to the time of the suggested invention or of the emergence of the motive or influence to invent or falsify, as tending to rebut the charge [of fabrication].'" *State v. Richcreek*, 196 Ohio App.3d 505,

2011-Ohio-4686, 964 N.E.2d 442 (6th Dist.), quoting *Motorists Mut. Ins. Co. v. Vance*, 21 Ohio App.3d 205, 207, 486 N.E.2d 1206 (10th Dist.1985). The Sixth District has succinctly explained the timing component of Evid.R. 801(D)(1)(b) as follows:

> [O]nly prior consistent statements made before the alleged motive to fabricate arose are admissible. The issue is not when the charge was made, but when the improper motive arose. If the facts giving rise to the motive to falsify existed before the disputed consistent statements, then Evid.R. 801(D)(1)(b) does not apply and the statements are inadmissible.

(Citations and quotations omitted). *Richcreek* at ¶ 59.

{¶74} Miller does not dispute that the state's reason for offering the witnesses satisfied the rule. His argument rests with the timing of Godfrey's statements; he argues that, at the time that Godfrey made the statements to his girlfriend and mother, Godfrey possessed an improper motive to implicate Miller, thereby excluding application of Evid.R. 801(D)(1)(b). The state fails to refute this argument. We find Miller's argument persuasive.

{¶75} Godfrey and Miller were the only two other people in the vehicle at the time that Rich was shot. Godfrey's alleged improper motive to point the finger at Miller in order to exculpate himself existed immediately following the shooting. Because Godfrey's statements to his girlfriend and mother were made after the shooting, we agree with Miller that these statements were not admissible under Evid.R. 801(D)(1)(b).

{¶76} We find, however, that Mays's hearsay statements were admissible pursuant to the excited utterance exception under Evid.R. 803(2). The rule defines an excited utterance as "[a] statement relating to a startling event or condition made while the

declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). Godfrey told Mays what happened immediately following the shooting. According to Mays's testimony, Godfrey was in shock and crying at the time that he told her what happened. Godfrey's statements, therefore, were made while he was still frightened and under the stress of the shooting; the statements were not the product of reflective thought. *See State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 94, 96. Thus, the evidence supports admissibility of Godfrey's statement as an excited utterance.

{¶77} As for Means's hearsay statements, however, the same exception does not apply. Godfrey told his mother what happened the next day. From her testimony, there was no indication that he was still under the stress of the event. Although Means testified that Godfrey was afraid, we find this insufficient to render his statements as excited utterances. We find, therefore, that Means's statements as to what Godfrey told her constituted inadmissible hearsay that should not have been admitted.

{¶78} The erroneous admission of hearsay statements, however, does not necessarily provide grounds for reversal if the error was harmless. *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992). Crim.R. 52(A) describes a harmless error as one that "does not affect substantial rights (and therefore) shall be disregarded." In order to find harmless error in a criminal matter, a reviewing court must find that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). When determining whether the admission of evidence is

harmless, this court must find that "there is no reasonable probability that the evidence may have contributed to the defendant's conviction." *State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789, ¶ 20.

{¶79} The record reveals that Means's testimony was cumulative to Godfrey's in-court testimony as well as Mays's testimony. Further, Mays's testimony was considerably more credible than Means's, given that Godfrey told her what happened immediately following the shooting. Based on the proper admission of Mays's and Godfrey's testimonies, we find Means's hearsay statements constituted harmless error in this case.

{¶80} The fifth assignment of error is overruled.

Speedy Trial

{¶81} Miller argues in his sixth assignment of error that his statutory and constitutional speedy-trial rights were violated. We disagree.

*A. Statutory Speedy-Trial Rights*

{¶82} Miller first contends that the trial court should have dismissed the case against him because he was not brought to trial within the statutory period. The state counters that Miller fails to account for his own delays, motions, and continuances that tolled the statutory period.

{¶83} R.C. 2945.71(C)(2) provides that a person against whom a felony charge is pending shall be brought to trial within 270 days after the person's arrest. For purposes of computing time under R.C. 2945.71(C)(2), each day the accused is held in jail in lieu of

bail on the pending charge shall be counted as three days. *See* R.C. 2945.71(E). Thus, subject to certain tolling events, a jailed defendant must be tried within 90 days. *Id.*

**{¶84}** When reviewing a speedy-trial question, the appellate court must count the number of delays chargeable to each side and then determine whether the number of days not tolled exceeded the time limits under R.C. 2945.71. *State v. Ferrell*, 8th Dist. Cuyahoga No. 93003, 2010-Ohio-2882, ¶ 20. Furthermore, this court must construe the statutes strictly against the state when reviewing the legal issues in a speedy-trial claim. *See Brecksville v. Cook*, 75 Ohio St.3d 53, 661 N.E.2d 706 (1996).

**{¶85}** Once the statutory limit has expired, the defendant has established a prima facie case for dismissal. *State v. Butcher*, 27 Ohio St.3d 28, 30-31, 500 N.E.2d 1368 (1986). At that point, the burden shifts to the state to demonstrate that sufficient time was tolled pursuant to R.C. 2945.72. *Cook* at 55-56. If the state has violated a defendant's right to a speedy trial, then the court must dismiss the charges against the defendant. R.C. 2945.73(B).

**{¶86}** Here, there is no dispute that Miller was held in jail; therefore, the trial court was required to have his trial within 90 days, subject to any tolling events.

**{¶87}** Miller was arrested on March 12, 2013; his speedy-trial time started running the following day and would have expired on June 10, 2013. Miller was not brought to trial until July 15, 2013 — 35 days beyond the statutory speedy-trial time.

**{¶88}** Under R.C. 2945.72, however, speedy-trial time may be tolled by several events, including the following:

(D) Any period of delay occasioned by the neglect or improper act of the accused;

(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

* * *

(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]

{¶89} Miller concedes that a combined total of 13 days were tolled to account for his discovery request and his motion to hire an investigator. He further acknowledges a tolling period of 30 days to account for his delay in responding to the state's reciprocal request for discovery. Thus, based on Miller's own acknowledged tolling events, the speedy-trial clock extended more than 35 days, thereby negating any statutory speedy-trial violation in this case. Moreover, the record reveals that other tolling events occurred, including Miller's requests for continuances as well as change of counsel, that extended the time even further.

{¶90} We find no support in the record to support Miller's claim that his statutory speedy-trial rights were violated.

B. *Constitutional Speedy-Trial Rights*

{¶91} Miller further argues that his constitutional speedy-trial rights were violated by the "indefinite tolling of speedy-trial time for not responding to the state's demand for discovery." We find no merit to this argument.

**{¶92}** "There are four broad factors within the framework for analyzing constitutional speedy-trial claims: the length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *State v. Castro*, 8th Dist. Cuyahoga No. 100379, 2014-Ohio-2398, citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The length of delay is the triggering mechanism. *State v. Kraus*, 2d Dist. Greene No. 2011-CA-35, 2013-Ohio-393, ¶ 23, citing *Barker*. "'Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *Id.*, quoting *Barker*. "Generally, courts have found that a delay approaching one year becomes 'presumptively prejudicial.'" *State v. Winn*, 8th Dist. Cuyahoga No. 98172, 2012-Ohio-5888, ¶ 44, citing *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), fn. 1.

**{¶93}** First, there is no indication that the trial court relied on an indefinite tolling period as the grounds for denying Miller's motion to dismiss. Second, where Miller was brought to trial less than six months after his arrest and his conduct contributed to the alleged delays, we fail to find any delay that is presumptively prejudicial to trigger consideration of the *Barker* factors. *See Castro* (over a year and a half between the arrest and the defendant's trial was not presumptively prejudicial because delays were for the defendant's benefit and thus contributed to the delay in timely prosecuting).

**{¶94}** Having found no statutory or constitutional speedy-trial violation, we overrule the sixth assignment of error.

<u>Sentence</u>

**{¶95}** In his final assignment of error, Miller argues that his sentence is contrary to law because the trial court failed to engage in a proportionality analysis as required under R.C. 2929.11(B). He also argues the trial court failed to make the requisite findings to support the imposition of consecutive sentences.

*Standard of Review*

**{¶96}** R.C. 2953.08(G)(2) states that when reviewing felony sentences, "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." Rather, the statute states that if we "clearly and convincingly" find that (1) "the record does not support the sentencing court's findings under [R.C. 2929.14(C)(4)]," or that (2) "the sentence is otherwise contrary to law," then we "may increase, reduce, or otherwise modify a sentence * * * or [we] may vacate the sentence and remand the matter to the sentencing court for re-sentencing." R.C. 2953.08(G)(2).

*Contrary to Law*

**{¶97}** Miller attacks his sentence as being contrary to law on the grounds that the trial court failed to consider the sentencing purposes in R.C. 2929.11.

**{¶98}** The trial court has the full discretion to impose any term of imprisonment within the statutory range, but it must consider the sentencing purposes in R.C. 2929.11 and the guidelines contained in R.C. 2929.12. *State v. Holmes*, 8th Dist. Cuyahoga No. 99783, 2014-Ohio-603, ¶ 8.

**{¶99}** R.C. 2929.11(A) provides that a sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing: (1) "to protect the public from future crime by the offender and others," and (2) "to punish the offender using the minimum sanctions that the court determines accomplish those purposes." The sentence imposed shall also be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

**{¶100}** Relying on R.C. 2929.11(B), Miller argues that his sentence is contrary to law "because the court did not engage in a proportionality analysis before imposing a sentence of 49 years to life in prison." We find no merit to this argument.

**{¶101}** "This court has refused to find that a sentence is contrary to law when the sentence is in the permissible range and the court's journal entry states that it 'considered all required factors of the law' and 'finds that prison is consistent with the purposes of R.C. 2929.11.'" *State v. Williams*, 8th Dist. Cuyahoga No. 100042, 2014-Ohio-1618, quoting *State v. May*, 8th Dist. Cuyahoga No. 99064, 2013-Ohio-2697, ¶ 16. Indeed, R.C. 2929.11 and 2929.12 do not require judicial fact-finding; rather, they direct trial courts to "consider" the factors. *May* at ¶ 15. Further, a court speaks through its journal entries. *Id.* at ¶ 16.

**{¶102}** Here, the trial court imposed a sentence within the statutory range on each offense and specifically noted in the journal entry that "the court considered all required

factors of the law" and found that "prison is consistent with the purpose of R.C. 2929.11."

We, therefore, find no merit to his claim that his sentence is contrary to law.

*Consecutive Sentence Findings*

**{¶103}** Judicial fact-finding is required to overcome the statutory presumption in favor of concurrent sentences. *State v. Bonnell*, Slip Opinion No. 2014-Ohio-3177, ¶ 23. Specifically, "R.C. 2929.14(C)(4) requires the trial court to make statutory findings prior to imposing consecutive sentences, and Crim.R. 32(A)(4) * * * directs the court to state those findings at the time of imposing the sentence." *Id.* at ¶ 26. First, the trial court must find that "consecutive service is necessary to protect the public from future crime or to punish the offender." R.C. 2929.14(C)(4). Next, the trial court must find that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." *Id.* Finally, the trial court must find that at least one of the following applies: (1) the offender committed one or more of the multiple offenses while awaiting trial or sentencing, while under a sanction, or while under postrelease control for a prior offense; (2) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; or (3) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. *Id.*

**{¶104}** In *Bonnell*, the Ohio Supreme Court recently recognized that a trial court must also incorporate its statutory findings for consecutive sentences into the sentencing entry. *Id.* at ¶ 29. The court further recognized, however, that "[a] trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law[.]" *Id.* Instead, "such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Id.*

**{¶105}** The record before us reveals that the trial court made all the necessary findings to support the imposition of consecutive sentences. Specifically, the trial court stated the following in support of consecutive sentences:

> I have found that it is necessary obviously to protect the public from future crime, or to punish the offender. The sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.
>
> The defendant did commit this offense while being on parole for a murder charge in which he served approximately 18 years. He was on parole, just barely 2 months.
>
> So that obviously shows that consecutive sentences are necessary to protect the public, given the fact of his prior criminal record of, I think it was aggravated murder, but ultimately he was found guilty of murder.

**{¶106}** Miller argues that the trial court "made an effort" to comply with R.C. 2929.14(C) before imposing consecutive sentences, but wrongly believed that Miller's being on parole while committing the offense constituted a finding under R.C. 2929.14(C)(4)(a). But Miller misapplies the trial court's finding. The trial court's reference to Miller having been recently released from prison on a murder conviction

pertained to the finding under R.C. 2929.14(C)(4)(c), i.e., that the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶107} Having found that the trial court made the required findings under R.C. 2929.14(C)(4) to support the imposition of consecutive sentences and that the trial court considered all required factors of law, the final assignment of error is overruled. The record reveals, however, that the trial court failed to incorporate in the journal entry the statutory findings supporting consecutive sentences that it made at sentencing. Thus, in light of *Bonnell*, this matter is remanded to the trial court for the court to issue a new sentencing journal entry, nunc pro tunc, to incorporate its findings.

{¶108} Judgment affirmed and case remanded for a new sentencing journal entry.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY J. BOYLE, ADMINISTRATIVE JUDGE

MARY EILEEN KILBANE, J., and
EILEEN T. GALLAGHER, J., CONCUR

Appendix A

I.      The trial court erred by denying appellant's motion for a mistrial in violation of his federal and state constitutional rights to due process and a fair trial.

II.     The trial court erred by failing to merge all allied offenses of similar import and by imposing separate sentences for allied offenses which violated appellant's state and federal rights to due process and protections against double jeopardy.

III.    Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal.

IV.     The convictions were against the manifest weight of the evidence.

V.      The trial court erred by admitting the testimony of two witnesses who were not timely disclosed in compliance with Crim.R. 16 and whose testimony was inadmissible hearsay violating appellant's right to due process and a fair trial.

VI.     The trial court erred by denying appellant's motion to dismiss for violation of his federal and state constitutional right to a speedy trial.

VII.    The trial court erred by imposing consecutive sentences that are contrary to law and not supported by the record.