[Cite as *State v. Pennington*, 2014-Ohio-5426.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100964**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**ROBERT M. PENNINGTON**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-568808-A

**BEFORE:** McCormack, J., Jones, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** December 11, 2014

**ATTORNEY FOR APPELLANT**

Matthew M. Nee
Nee & Bittinger, L.L.C.
26032 Detroit Rd.
Suite 5
Westlake, OH 44145


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By:   Andrew Rogalski
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

{¶1} Defendant-appellant Robert M. Pennington appeals his convictions for aggravated murder, aggravated robbery, aggravated burglary, murder, and felonious assault. Following a review of the record, we affirm and remand.

## Procedural History

{¶2} On November 13, 2012, Pennington was charged under a multiple count indictment as follows: (1) Count 1 — aggravated murder, in violation of R.C. 2903.01(A); (2) Count 2 — aggravated murder, in violation of R.C. 2903.01(B); (3) Count 3 — aggravated robbery, in violation of R.C. 2911.01(A)(3); (4) Count 4 — aggravated burglary, in violation of R.C. 2911.11(A)(1); (5) Count 5 — kidnapping, in violation of R.C. 2905.01(A)(3); (6) Count 6 — murder, in violation of R.C. 2903.02(B); (7) Count 7 — felonious assault, in violation of R.C. 2903.11(A)(1); and (8) Count 8 — felonious assault, in violation of R.C. 2903.11(A)(2). The named victim in each count was Roy F. Rose ("Rose"). All counts included one- and three-year firearm specifications, repeat violent offender specifications, and notice of prior conviction specifications. The prior conviction specifications were bifurcated, and the remaining charges proceeded to a jury trial.

{¶3} Prior to trial, Pennington moved for an indefinite continuance of trial based upon his assertion that he was "physically incompetent" to stand trial due, in large part, to end-stage liver failure. Although the basis for the motion was Pennington's physical ailments and his inability to withstand the physical rigors of a trial, the trial court noted that counsel's motion alluded to Pennington's competency. Therefore, the trial court referred Pennington for an evaluation by the court psychiatric clinic and scheduled a competency hearing for July 16, 2013. At the conclusion of the hearing, Pennington's counsel moved for an independent competency

evaluation. Following the hearing, the court found Pennington competent to stand trial and denied Pennington's motion for continuance and motion for an independent competency evaluation. On August 2, 2013, in an effort to accommodate Pennington's physical ailments, the trial court ordered the Cuyahoga County Sheriff to ensure that a member of Pennington's medical staff attend trial with Pennington in order to monitor his physical needs.

{¶4} Trial commenced on September 30, 2013. At the conclusion of the state's evidence, Pennington moved the court for a Crim.R. 29 dismissal, which was granted as to Count 5, kidnapping. On October 4, 2013, the jury found Pennington not guilty of aggravated murder, in violation of R.C. 2903.01(A), as charged in Count 1, and guilty of Counts 2, 3, 4, 6, 7, and 8, along with the firearm specifications. The court found Pennington not guilty of the repeat violent offender and notice of prior conviction specifications, finding no evidence of prior convictions.

{¶5} The court sentenced Pennington on October 10, 2013. For sentencing purposes, Counts 4, 6, 7, and 8, were merged with Count 2. On Count 2, the court sentenced Pennington to life, with parole eligibility after 30 years, and three years on the firearm specification. The court ordered this sentence to be served consecutively. On Count 3, the court sentenced Pennington to nine years, plus three years on the firearm specification, to be served consecutively. The court ordered the sentences for Counts 2 and 3 to be served concurrently.

### Evidence Presented at Trial

{¶6} At approximately 7:30 p.m., on November 1, 2012, David Lowe ("David") discovered his uncle, Roy F. Rose, lying on the floor of his home on West 65th Street and Madison Avenue, with his torso in the bathroom and his legs extended out towards the kitchen. David testified that he saw a trail of blood on the kitchen floor and a garbage can that had been

knocked over, with its contents spilling out. Thinking he heard a noise, he became panicked and ran out of the house. He drove to his brother, Wayne Lowe's, house, picked Wayne up, and brought him back to his uncle's house within minutes of initially finding his uncle. Upon arriving at Rose's house, and after David had explained what he saw, Wayne phoned 911.

{¶7} Cleveland Police Officer Ismael Quintana responded to the scene. Upon arriving at Rose's house, Officer Quintana discovered Rose's body in the bathroom with trauma to his face. The officer testified that Rose appeared to be dead. Officer Quintana and his partner, David Lam, discovered three tenants living in the upstairs of the home. One of the tenants, William Atwell, testified that he heard a "big thud" from his upstairs bedroom. Another tenant, Melby Miller, testified that around 7:30 p.m., he felt the building shake a little.

{¶8} Rose's neighbor, Amanda Kamms, testified that she had seen Rose outside his home approximately 6:30 p.m. on the evening of November 1. She stated that later that same evening, approximately 7:30 p.m., she heard a "pop - pop" that sounded like a loud firecracker. She paid no attention to the sound because, as she stated, "[there is] gunfire going off all over the place in our neighborhood."

{¶9} Cleveland Police detectives from the crime scene unit, upon the direction of the homicide unit detectives, collected evidence and took photographs of the scene. The detectives discovered and collected blood spots on the kitchen floor, the bathroom door frame, and papers on the kitchen table. The detectives discovered the trash can that had been knocked over. The trash can contained $21 cash and a wooden and gold-handled, folding knife with a broken handle. The broken handle was recovered on the floor next to the trash can. There was blood on both the butt end of the knife as well as the blade.

{¶10} Detective Frank Costanzo recovered and removed a spent bullet from the ceiling soffit in the kitchen and a spent bullet jacket and bullet fragment from under the kitchen table. Homicide detective Arthur Echols testified, however, that the detectives could not draw a conclusion regarding the recovered bullets because they were not discovered within the vicinity of the victim. Detective Echols also testified that the bullets that did, in fact, penetrate Rose's body were never recovered.

{¶11} The detectives also discovered medication, a handgun, and a knife on the table in the living room area. Detective Echols testified that the handgun found on the table was fully loaded with six rounds.

{¶12} Cuyahoga County medical examiner, Dr. Thomas Gilson, examined Roy Rose's body at the scene. He observed gunshot wounds to the head and left arm (entrance and exit wounds), as well as other "fresh injuries," or scrapes, to the cheek, arm, and knee. He opined that the scrapes were "relatively recent" due to the fact that there were no signs of healing. Dr. Gilson performed an autopsy on Rose and concluded that Rose died from a gunshot wound to the head and to the left arm. He testified that the manner of death was homicide. He further testified that the bullet that entered Rose's forehead was fired at close range, "no further than a couple inches away."

{¶13} Forensic scientist Lisa Przepynszy testified that she analyzed the victim's clothing for blood and defects such as bullet holes. In examining the defect in the victim's shirt, she concluded that the muzzle to target distance was approximately one to four feet, an intermediate range. Ms. Przepynszy tested blood stains from Rose's blue jeans and submitted them for DNA testing. She also collected blood samples from a knife that was recovered from the scene and she submitted them for DNA testing. She noted that the samples she collected from the knife

were submitted in addition to the samples previously collected from the police department at the scene, which were submitted directly to the DNA department. Finally, Ms. Przepynszy tested the spent bullets recovered at the scene. The spent bullet jacket and fragment discovered under the table tested positive for the presence of blood.

{¶14} Christine Scott, forensic DNA analyst, testified that she examined the victim's jeans and the blood samples from the kitchen floor, the door frame, papers from the kitchen table, and the knife discovered in the trash can. Following laboratory testing of the samples, Scott concluded that the laboratory test results revealed Pennington's DNA on all of the samples. Scott also testified that the knife contained DNA from both Pennington and Rose.

{¶15} April Chesbro, the victim's daughter, testified that Rose kept $50,000 in his top dresser drawer in his bedroom. He kept the money in small check boxes he had received from the bank. Chesbro stated that when she was permitted to enter the home approximately one week after Rose's murder, she discovered that the large sum of money was no longer in the dresser. She further testified that her father's home was "a mess," there were papers on the floor that indicated a struggle, and it looked like someone had been in his bedroom because it was "messier than normal" and it appeared that some items were "out of place and moved around." The medical examiner's office returned to the family $1,301 of blood-stained money discovered in Rose's pocket.

{¶16} Anita Miller, Pennington's cousin, also testified for the state. She stated that a couple of weeks prior to November 1, she heard Pennington discuss his plans to obtain a gun, shoot someone that Pennington claimed owed him money for a roofing job, steal the individual's truck, and leave the state. She heard Pennington also say that he wanted to locate painkillers. Miller further testified that a few days before the start of trial, she spoke with Pennington on the

telephone, during which time Pennington asked her to testify on his behalf, specifically asking her to testify that he did not steal the victim's money and that "the money was still in [Rose's] pocket."

{¶17} George Solley, Pennington's close friend, testified that he saw Pennington on November 5, 2012, and on that day, Pennington's hand was injured. Solley stated that Pennington's hand was cut open and looked white and red. In response to the state's questioning, Solley stated that "a knife leaves both cuts and holes." Pennington explained to Solley that his hand was injured during a fight. Solley further testified that Pennington was known to carry a wooden knife with a gold top and bottom and a locking blade. Finally, Solley stated that Pennington planned to go to Kentucky and then on to Tennessee.

{¶18} Detective Echols testified that Pennington was arrested in Tennessee on November 9, 2012, on the arrest warrant the detective issued. Detective Echols learned that Pennington was arrested with an injury to his hand and abdomen, and he directed that photos be taken of Pennington's injuries.

{¶19} Finally, the state presented to the jury a recorded telephone conversation between Pennington and his sister, Nancy Pennington, that took place on September 30, 2013, which was the afternoon of the first day of trial. During this conversation, Pennington expressed anger and frustration over George Solley's statement to the detectives about Pennington's hand injury, specifically objecting to Solley's statement about "the holes, * * * not just the cut," Pennington's "pocket knife," and his plans to go to Tennessee. Pennington instructed his sister to thank Solley "for keeping his f * * * mouth shut."

## Assignments of Error[1]

I.   The trial court erred by finding Pennington guilty of aggravated murder, aggravated robbery, aggravated burglary, murder, and felonious assault, based upon insufficient evidence.

II.   The trial court erred by finding Pennington guilty of notice of prior conviction specifications relating to counts two, three, four, six, seven, and eight, based upon insufficient evidence.

III.   The trial court erred by finding Pennington guilty contrary to the manifest weight of the evidence.

IV.   The trial court erred by failing to grant Pennington's motion for an independent competency evaluation.

V.   The trial court erred by permitting Anita Miller, an undisclosed pivotal witness, to testify in violation of Crim.R. 16.

VI.   Pennington's defense counsel provided ineffective assistance of counsel by failing to subpoena the doctor who authored Pennington's competency evaluation for purpose of Pennington's competency evaluation hearing.

VII.   Pennington's defense counsel provided ineffective assistance of counsel by failing to move for a continuance, a voir dire, or a mistrial, based upon the State's calling Anita Miller, an undisclosed pivotal witness, after the court swore-in the jury.

## Competency to Stand Trial

{¶20} In his fourth assignment of error, Pennington contends that the trial court erred by failing to grant his motion for an independent competency evaluation.

{¶21} A person who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense" may not stand trial. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 155, citing

---

[1]For ease of discussion, we will address the assignments of error out of order.

*Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." *Id.*, citing *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995). Competence is a question of a defendant's mental condition; it is not a question of the defendant's physical state. *State v. Kelley*, 6th Dist. Lucas No. L-90-340, 1992 Ohio App. LEXIS 102, * 8 (Jan. 17, 1992), citing R.C. 2945.37 and 2945.372; *see also State v. Banks*, 2d Dist. Champaign No. 94-CA-14, 1995 Ohio App. LEXIS 889 (Mar. 10, 1995).

{¶22} An adult defendant is presumed competent to stand trial:

> A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial * * *.

R.C. 2945.37 (G); *Berry* at 360.

{¶23} The defense bears the burden of production to rebut the presumption of competence. *State v. Williams*, 23 Ohio St.3d 16, 19, 490 N.E.2d 906 (1986).

{¶24} Under R.C. 2945.37(B), a trial court must hold a hearing on the issue of a defendant's competency if the issue is raised prior to trial. *State v. Jirousek*, 8th Dist. Cuyahoga No. 99641, 2013-Ohio-4796, ¶ 10. In a criminal proceeding, the competence of the defendant may be raised by the court, the prosecutor, or the defense. R.C. 2945.37(B). If the issue of competency is raised after the trial has commenced, however, the court shall hold a hearing on the issue "only for good cause shown or on the court's own motion." *Id.*

{¶25} Although a trial court is required to hold a hearing regarding a defendant's competency if the issue is raised prior to trial, the court may determine whether to order a

competency evaluation. *State v. Woodley*, 8th Dist. Cuyahoga No. 80732, 2003-Ohio-1950, ¶ 26; *State v. Johnson*, 9th Dist. Summit No. 25620, 2011-Ohio-6417, ¶12. R.C. 2945.371(A) provides that if the issue of a defendant's competence is raised, or if a defendant enters a plea of not guilty by reason of insanity, "the court may order one or more evaluations of the defendant's present mental condition or, in the case of a plea of not guilty by reason of insanity, of the defendant's mental condition at the time of the offense charged."

**{¶26}** There is no absolute right to an independent competency evaluation. *State v. Young*, 8th Dist. Cuyahoga No. 80059, 2003-Ohio-272, ¶ 13, citing *State v. Marshall*, 15 Ohio App.3d 105, 472 N.E.2d 1139 (8th Dist.1984). And the decision to order an evaluation is a matter within the discretion of the trial court. *State v. Perry*, 5th Dist. Richland No. 00-CA-83, 2001 Ohio App. LEXIS 2820, * 14 (June 14, 2001), citing *State v. Bailey*, 90 Ohio App.3d 58, 67, 627 N.E.2d 1078 (11th Dist.1992). We therefore review the trial court's decision to deny a defendant's motion for an independent competency evaluation for an abuse of that discretion. *See Johnson* at ¶ 13. An abuse of discretion implies that the trial court's judgment was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶27}** Here, prior to the start of trial, Pennington moved for an indefinite continuance of trial based upon his assertion that he was "physically incompetent" to stand trial because of an array of physical maladies, including liver failure.[2] He claimed that medications he was taking

---

[2]According to the record, Pennington attached to his motion a CD containing more than 700 pages of his medical records, which included records from MetroHealth Hospital and the jail infirmary. The record on appeal does not include the CD containing Pennington's medical records.

"interfere with his ability to concentrate" and his physical condition prevents him from being able to attend and participate in his trial and, therefore, assist in his own defense.

{¶28} The court ordered that Pennington undergo an examination by the court psychiatric clinic for an evaluation of his competence to stand trial. In its order, the court requested that the evaluation include, to the extent possible, an opinion on Pennington's ability to be present for and participate in courtroom proceedings and how normal proceedings may be modified to accommodate any infirmities Pennington may have. The court scheduled a competency hearing for July 16, 2013.

{¶29} At the competency hearing, the only evidence presented in support of Pennington's alleged incompetence was his medical records. Pennington's counsel objected to the state's suggestion to stipulate to the contents of the evaluation performed by Dr. Karl E. Mobbs of the court psychiatric clinic and did not secure his testimony for the hearing. Counsel claimed that the competency evaluation failed to properly address Pennington's medical issues, with the exception of Dr. Mobbs's notation that "Pennington tolerated the one-hour interview well" and that "the court allowing him breaks during the trial would be a good idea." Defense counsel claimed that there was nothing in Dr. Mobbs's report to indicate that any of Pennington's medical records were even considered. At the close of the hearing, Pennington's counsel requested an independent competency evaluation in order to ascertain that Pennington is "not medically competent" to stand trial, conceding that Pennington's mental status "was never at issue."

{¶30} On July 29, 2013, the trial court issued an order finding Pennington competent to stand trial and denying Pennington's motion for a continuance and motion for a second, independent competency evaluation. In its order, the court noted that it reviewed the medical

records submitted by Pennington and stated that, "although [Pennington's] numerous conditions are no doubt serious, nowhere in the records is there a suggestion that any of Pennington's doctors are of the opinion that he cannot adequately participate in a trial."[3] The court further noted that Pennington provided no testimonial evidence about his medical condition. The court found, upon its review of the medical records submitted, that Pennington: has not overcome the presumption that he is mentally competent to stand trial; cannot demonstrate that a "'present mental condition' prevents [him] from understanding the nature and objective of the proceedings against him or of assisting in his defense"; and cannot show that he is not physically well enough to attend his trial.

{¶31} In light of the above, we cannot find that the trial court abused its discretion in denying Pennington's motion for an independent competency evaluation. When Pennington raised the issue of competency prior to trial, the trial court ordered a competency evaluation and held a hearing. The only evidence presented at the hearing was Pennington's medical records, none of which indicated that Pennington's physical conditions would prevent him from attending his trial or contributing to his defense. Further, there was no evidence that Pennington suffered from a mental condition that prevented him from understanding the nature and objective of the proceedings against him. Pennington's counsel, in fact, conceded that Pennington's mental

---

[3]Pennington's medical records that were reviewed by the court include: a July, 2012 emergency department visit for right foot and ankle pain after falling from a ladder seven months before; a December 4, 2012 admission for a possible right pelvic fracture after falling while walking with a cane; a January 30, 2013 admission for right upper quadrant pain where Pennington was discharged on February 1, 2013, without restrictions; an April 26 through May 10, 2013 admission for probable staph infection; a May 14, 2013 hospital visit, apparently for congestive heart failure; and a review of other diagnoses, such as hepatitis C, cirrhosis of the liver, pancytopenia (a blood cell deficiency), and acute kidney injury.

status was not an issue.  We therefore affirm the trial court's denial of Pennington's motion for an independent competency evaluation.

{¶32} Pennington's fourth assignment of error is overruled.

### Nondisclosure of a Witness

{¶33} In his fifth assignment of error, Pennington claims that the trial court erred by permitting Anita Miller to testify in violation of Crim.R. 16.  Specifically, Pennington objects to the court allowing the state to call Miller,  who was not disclosed prior to trial as a potential witness.  Pennington argues that the untimely disclosure of this witness amounted to a willful violation that prejudiced his defense and warranted exclusion of the witness at trial.  The state submits that it learned of the witness through Pennington, it provided the witness's name as soon as it learned of the witness, even before learning the substance of her testimony, and its actions upon learning of the witness were timely and reasonable.

{¶34} Crim.R. 16 governs discovery matters in a criminal proceeding.  The purpose of this rule is "to provide the parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system, the rights of defendants, and the well-being of witnesses, victims, and society at large."  Crim.R. 16(A).  Crim.R. 16(I), which governs the disclosure of witnesses, provides that "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal."  Under Crim.R. 16(L)(1), if it is brought to the attention of the trial court that a party has failed to comply with this discovery rule, the trial court may order or permit the discovery, order a continuance, prohibit the party from introducing the material not disclosed, or make any other

order it deems just under the circumstances. *State v. Miller*, 8th Dist. Cuyahoga No. 100461, 2014-Ohio-3907, ¶ 66.

{¶35} A trial court has broad discretion in regulating discovery and in determining the appropriate sanction for discovery violations. *State v. Smiler*, 8th Dist. Cuyahoga No. 100255, 2014-Ohio-1628, ¶ 13, citing *State v. Wiles*, 59 Ohio St.3d 71, 78, 571 N.E.2d 97 (1991). Upon imposing a sanction, however, the trial court must conduct an inquiry into the surrounding circumstances and impose "the least severe sanction that is consistent with the purpose of the rules of discovery." *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of the syllabus.

{¶36} Three factors that govern a trial court's exercise of discretion in imposing a sanction for a discovery violation include (1) whether the failure to disclose was a willful violation of Crim.R. 16; (2) whether foreknowledge of the undisclosed material would have benefitted the accused in the preparation of a defense; and (3) whether the accused was prejudiced. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus. We review a trial court's sanction for a discovery violation for an abuse of discretion. *State v. Tran*, 8th Dist. Cuyahoga No. 100057, 2014-Ohio-1829, ¶ 9.

{¶37} Here, the record reveals that the state first became aware of Anita Miller at some point during jury selection, from Crystal Calhoun, a potential state's witness, who mentioned Miller in the context of a potential witness for the defense. In response to this information, Detective Arthur Echols then began to research Miller and attempted to locate her. During the lunch break on Monday, September 30, the first day of trial, the state listened to Pennington's recorded jail cell phone calls that were made over the weekend. At this time, the state learned

that on either September 27 or 28, the weekend before trial, a jail cell telephone conversation took place between Pennington and his sister, Nancy Pennington, concerning Miller. During this conversation, Pennington contemplated calling Miller as his witness in order to impeach a state's witness. Specifically, Pennington instructed Nancy to ensure that Miller would not say anything damaging against him at trial. At approximately 5:00 p.m. the same day the prosecutor listened to the recorded conversations, the state supplemented its witness list to include Anita Miller. Thereafter, the state learned from Detective Echols of the substance of Miller's testimony.

{¶38} On Tuesday morning, October 1, before the commencement of the second day of trial, the state provided to the defense a summary of the substance of Miller's testimony. Pennington objected to Miller's testimony. In response, the court heard arguments from both the state and the defense concerning Miller's testimony and the facts that led to Miller's inclusion on the witness list. The court then overruled Pennington's objection and ordered the state to make Detective Echols available to the defense "for a reasonable length of time so that [Pennington] can get some greater detail * * *on the content of [Miller's] anticipated testimony."

{¶39} In light of the above, we cannot find that the state's failure to disclose Anita Miller as a potential witness prior to trial was a willful violation of Crim.R. 16. The record demonstrates that, in light of the circumstances upon which the state discovered Anita Miller, the state's disclosure of Miller as a witness was timely and reasonable. Further, Pennington provides no evidence that the prosecutor had knowledge of Miller's identity and testimony prior to the time of the prosecutor's disclosure.

{¶40} Moreover, even assuming that the prosecutor's disclosure of the witness after trial had commenced constituted a discovery violation, we find that the trial court imposed the least

severe sanction consistent with the discovery rules. Specifically, the trial court provided defense counsel the opportunity to interview Detective Echols in order to explore the content of Miller's anticipated testimony before Miller testified, thus removing any unfair surprise or prejudice. *See Miller*, 8th Dist. Cuyahoga No. 100461, 2014-Ohio-3907, at ¶ 69. We therefore find no abuse of discretion by the trial court in permitting the testimony of Anita Miller.

**{¶41}** Pennington's fifth assignment of error is overruled.

### Sufficiency and Manifest Weight of the Evidence

**{¶42}** Pennington claims that the state failed to provide sufficient evidence upon which to convict him of aggravated murder, aggravated robbery, aggravated burglary, murder, felonious assault, and a firearm specification. He also argues that his convictions were against the manifest weight of the evidence.

**{¶43}** When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**{¶44}** While the test for sufficiency of the evidence requires a determination whether the state has met its burden of production at trial, a manifest weight challenge questions whether the

state has met its burden of persuasion. *Thompkins* at 390. Also unlike a challenge to the sufficiency of the evidence, a manifest weight challenge raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶45}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

**{¶46}** We note initially that the elements of an offense may be established by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Circumstantial evidence is testimony that is not based on actual personal knowledge or observation of controversial facts, rather it is based on """"other facts from which deductions are drawn, showing indirectly the facts sought to be proved.""" *State v. Powell*, 8th Dist. Cuyahoga No. 99386, 2014-Ohio-2048, ¶ 6, quoting *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988), quoting *Black's Law Dictionary* 221 (5th Ed.1979). Circumstantial and direct evidence are of equal evidentiary value. *State v. Santiago*, 8th Dist. Cuyahoga No. 95333,

2011-Ohio-1691, ¶ 12. And in some cases, circumstantial evidence may be "'more certain, satisfying and persuasive than direct evidence.'" *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶47} Pennington was convicted of aggravated murder in violation of R.C. 2903.01(B), murder in violation of R.C. 2903.02(B), aggravated robbery in violation of R.C. 2911.01(A)(3), aggravated burglary in violation of R.C. 2911.11(A)(1), and two counts of felonious assault, in violation of R.C. 2903.11(A)(1) and (2). Pennington was also convicted of a firearm specification in violation of R.C. 2941.145(A).

{¶48} R.C. 2903.01(B), aggravated murder, provides that

[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

{¶49} A person acts purposely when it is his "specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Purpose," therefore, depends on an intended result. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 72.

{¶50} Circumstantial evidence can be used to demonstrate purpose or intent. *State v. Martin*, 8th Dist. Cuyahoga No. 91276, 2009-Ohio-3282, ¶ 23. Intent may therefore be ascertained from the surrounding facts and circumstances in the case:

"[The] surrounding facts and circumstances include the nature of the instrument used, its tendency to end life if designed for that purpose, and the manner in which any wounds were inflicted. A jury can infer intent to kill by the defendant's use

of a firearm, an inherently dangerous instrumentality, the use of which is likely to produce death."

*Id.*, quoting *State v. Mackey*, 8th Dist. Cuyahoga No. 75300, 1999 Ohio App. LEXIS 5902 (Dec. 9, 1999); *see State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 48 (shooting victim in the face and head from close range during the course of aggravated robbery demonstrated a specific intent to kill).

**{¶51}** Under R.C. 2903.02(B), felony murder, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]"

**{¶52}** R.C. 2911.01(A)(3), aggravated robbery, states that

[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another.

**{¶53}** R.C. 2911.11(A)(1), aggravated burglary, provides that

[n]o person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another.

**{¶54}** Criminal trespass is defined as knowingly entering or remaining on the premises of another "without privilege to do so." R.C. 2911.21(A)(1). "Privilege" is defined as "an

immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). The commission of a violent crime committed in the residence of one other than the defendant terminates the privilege to remain in the home, and such conduct always constitutes aggravated burglary. *State v. Mitchell*, 8th Dist. Cuyahoga No. 94287, 2010-Ohio-5775, ¶ 15, citing *State v. Steffen*, 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987); *State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 and 100247, 2014-Ohio-2181, ¶ 35. Therefore, even if the defendant lawfully gained entry to another's residence, the privilege to remain in the home was revoked once the defendant assaulted the resident. *Id.*

**{¶55}** Under R.C. 2903.11(A), felonious assault, "[n]o person shall knowingly * * * (1) [c]ause serious physical harm to another * * *, or (2) [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

**{¶56}** And finally, R.C. 2941.145(A), the firearm specification, requires proof beyond a reasonable doubt that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

**{¶57}** Pennington argues that the evidence presented at trial was insufficient to convict him of all counts. Specifically, he claims that the state failed to produce any physical evidence that he possessed or fired a firearm, or that he used one to fatally wound the victim. Pennington submits that the state failed to provide any physical evidence linking him to a firearm, stating that he did not have a firearm when he was arrested, nor did the state provide a positive gunshot residue analysis. Finally, Pennington claims there is insufficient evidence demonstrating that he committed a burglary or a robbery, stating that the state provided no credible evidence that the

victim possessed a large sum of money or that this money was taken by him. We find, however, that Pennington's arguments are without merit, and the state provided sufficient circumstantial and direct evidence to support his convictions.

**{¶58}** Here, the state provided the testimony of Anita Miller, Pennington's cousin. Miller testified that Pennington planned to obtain a gun, shoot someone who purportedly owed him money, steal the individual's truck, and leave the state. The evidence showed that Rose died from a gunshot wound to the head and to the left arm. The gunshot wound to the head was fired at close range. Pennington's friend, George Solley, testified that Pennington had an injury to his hand that resembled a hole and he was planning to leave the state. He also testified that Pennington typically carried a wooden knife with a gold top and bottom and locking blade. A knife matching that description was discovered in pieces in a knocked-over trash can and on the floor at the scene. And Pennington's DNA was found on the kitchen floor, the door frame, papers on the kitchen table, the knife found in the trash can, and on the victim's jeans. The knife also contained the victim's DNA. Pennington was arrested in Tennessee approximately one week after the murder with injuries to his hand and his abdomen. The state presented evidence of Pennington's own angry words in a jail phone call to his sister during which Pennington expressed frustration over George Solley's testimony against him.

**{¶59}** Additionally, the state provided the testimony of Rose's daughter, April Chesbro. Chesbro testified that Rose kept $50,000 in his dresser drawer in his bedroom and this money was gone after her father's murder. She also testified that, upon returning to her father's house, she found that his bedroom was "messier than usual" and it appeared that someone had been in the bedroom because items were "out of place and moved around." She further testified that $1,301 of blood-stained money was recovered from her father's pocket. Miller testified that

Pennington asked her to testify that he did not steal the victim's money, but rather, the money was in Rose's pocket.

{¶60} Based upon the above, after viewing the evidence, both direct and circumstantial, in a light most favorable to the prosecution, we find that any rational trier of fact could have found the crimes proved beyond a reasonable doubt. Moreover, we find the jury's verdicts were supported by the manifest weight of the evidence. Pennington's argument that the state's witnesses were not credible is not well taken. Credibility is within the province of the trier of fact, and the jury was free to believe all, part, or none of the testimony of each witness. We cannot say that this is the exceptional case where the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶61} Pennington's first and third assignments of error are overruled.

### Notice of Prior Conviction

{¶62} Pennington also claims in the second assignment of error that there was insufficient evidence upon which to convict Pennington of the notice of prior conviction specifications pertaining to counts two, three, four, six, seven, and eight.

{¶63} Pennington was charged with notice of prior conviction specifications under R.C. 2929.13(F)(6) in Counts 2, 3, 4, 6, 7, and 8. The specifications were tried to the court. The state admitted on the record that it did not introduce evidence of Pennington's prior convictions. Thereafter, having found no evidence supporting the prior convictions, the trial court found Pennington not guilty of the specifications. The court's sentencing journal entry of October 7, 2013, however, erroneously reflected that Pennington was found guilty of the specifications relating to the above stated counts.

**{¶64}** Although a court speaks through its journal entries, clerical errors may be corrected at any time in order to conform to the transcript of the proceedings. *State v. Steinke*, 8th Dist. Cuyahoga No. 81785, 2003-Ohio-3527, ¶ 47; Crim.R. 36. Trial courts retain continuing jurisdiction to correct clerical errors in judgments by nunc pro tunc entry to reflect what the court actually decided. *In re D.P.*, 8th Dist. Cuyahoga No. 100597, 2014-Ohio-3324, ¶ 10, citing *State ex rel. Cruzado v. Zaleski*, 111 Ohio St.3d 353, 2006-Ohio-5795, 856 N.E.2d 263, ¶ 18-19.

**{¶65}** Here, the record clearly reflects that Pennington was found not guilty of the notice of prior conviction specification attendant to Counts 2, 3, 4, 6, 7, and 8. The court's sentencing journal entry reflecting a finding of guilt as to the specification is a clerical error. We therefore remand the case for the trial court to correct its sentencing journal entry of October 7, 2013, nunc pro tunc, to accurately reflect what the court actually decided.

### Ineffective Assistance of Counsel

#### A.

**{¶66}** In his sixth assignment of error, Pennington claims that his defense counsel provided ineffective assistance of counsel by failing to subpoena the doctor who authored Pennington's competency evaluation for purpose of Pennington's competency evaluation hearing. We disagree.

**{¶67}** In order to establish a claim of ineffective assistance of counsel, Pennington must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Ohio, every properly licensed attorney is presumed to be competent and, therefore, a defendant

claiming ineffective assistance of counsel bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985).

{¶68} Counsel's performance will not be deemed ineffective unless and until the performance is proven to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Iacona*, 93 Ohio St.3d 83, 105, 752 N.E.2d 937 (2001). Furthermore, decisions on strategy and trial tactics are generally granted wide latitude of professional judgment, and it is not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers. *State v. Gau*, 11th Dist. Ashtabula No. 2005-A-0082, 2006-Ohio-6531, ¶ 35, citing *Strickland*. Courts must generally refrain from second-guessing trial counsel's strategy, even where that strategy is "questionable," and appellate counsel claims that a different strategy would have been more effective. *State v. Jalowiec*, 91 Ohio St.3d 220, 237, 744 N.E.2d 163 (2001).

{¶69} As previously discussed, a defendant is legally incompetent if, because of his present mental condition, he is incapable of understanding the nature and objective of the proceedings against him or of assisting in his defense. R.C. 2945.37(G). Competence, therefore, is a question of a defendant's mental condition. *Kelley*, 6th Dist. Lucas No. L-90-340, 1992 Ohio App. LEXIS 102, at * 8.

{¶70} Here, Pennington's trial counsel raised the issue of physical competency, claiming that Pennington's physical ailments prevented him from participating in the proceedings. Counsel conceded that Pennington's mental status is not in question. Further, the record is devoid of any evidence demonstrating that Pennington suffered from a mental illness that could interfere with his ability to understand the nature of the proceedings or assist in his own defense. Moreover, Pennington provides no evidence that had Dr. Mobbs testified at the competency

hearing, Pennington would have been found incompetent to stand trial. We therefore do not find that trial counsel was ineffective by failing to subpoena Dr. Mobbs.

{¶71} Pennington's sixth assignment of error is overruled.

B.

{¶72} In his seventh assignment of error, Pennington claims that his defense counsel provided ineffective assistance of counsel by failing to move for a continuance, a voir dire, or a mistrial, based upon the state's calling Anita Miller to testify. Again, we disagree.

{¶73} In light of the record before us, and our finding that the trial court's allowance of Miller's testimony was proper under the circumstances, we cannot find that trial counsel's performance fell below an objective standard of reasonable representation. As previously discussed in Pennington's fifth assignment of error, Pennington's trial counsel objected to the allowance of Miller's testimony immediately upon learning of the state's intention to call her and zealously argued in opposition to her testimony. Following the hearing on Tuesday, October 1, and defense counsel's objection, the trial court ordered that Detective Echols be made available for a reasonable period of time for the specific purpose of providing the defense an opportunity to learn the substance of Miller's testimony, thereby mitigating any unfair surprise or prejudice. And when Miller took the stand one day later, on Wednesday, October 2, defense counsel cross-examined her. Appellate counsel's statement that a continuance or voir dire would have mitigated the defense's ignorance of the substance of Miller's testimony is not well taken. Nor is it evidence that trial counsel was ineffective for not seeking a continuance. *See Jalowiec*, 91 Ohio St.3d at 237, 744 N.E.2d 163 (2001).

{¶74} Moreover, even had we found counsel's performance to be deficient, Pennington has failed to show how a continuance or voir dire would have changed the outcome of the trial.

We therefore do not find that trial counsel was ineffective for not seeking a continuance or voir dire of Anita Miller.

**{¶75}** Pennington's seventh assignment of error is overruled.

**{¶76}** Judgment affirmed, and remanded for the limited purpose of correcting the trial court's sentencing entry to reflect that Pennington was found not guilty of the notice of prior conviction specification attendant to Counts 2, 3, 4, 6, 7, and 8.

**{¶77}** It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

LARRY A. JONES, SR., P.J., and
SEAN C. GALLAGHER, J., CONCUR